[Cite as *State v. Smith*, 2017-Ohio-2708.]

STATE OF OHIO, BELMONT COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO. 15 BE 0064 |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| WILLIAM DOUGLAS SMITH, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS: Criminal Appeal from the Court of Common Pleas of Belmont County, Ohio Case No. 15-CR-138(B)

JUDGMENT: Affirmed.

APPEARANCES:

For Plaintiff-Appellee: No Brief Filed.

For Defendant-Appellant: Atty. Sandra Nicholoff
101 West Main Street, Suite 206
St. Clairsville, Ohio 43950

JUDGES:

Hon. Carol Ann Robb
Hon. Cheryl L. Waite
Hon. Mary DeGenaro

Dated: April 28, 2017

ROBB, P.J.

{¶1} Defendant-Appellant William Douglas Smith appeals his conviction in the Belmont County Common Pleas Court of complicity to rape of a child under ten years of age. He first argues the court should not have admitted evidence as to portions of his conversation with the principle offender. He also contests the court's decision to overrule his suppression motion. Lastly, he challenges the sufficiency of the evidence and the weight of the evidence. For the following reasons, the trial court's judgment is affirmed.

STATEMENT OF THE CASE

{¶2} On July 2, 2015, Appellant and co-defendant Peggy Sue Horstman were jointly indicted for rape of a child under the age of ten. *See* R.C. 2907.02(A)(1)(b),(B). The indictment alleged the sexual conduct occurred on or about February 1, 2015 through May 1, 2015; the child was approximately ten months old at the beginning of this time range. A motion for severance was mooted by Horstman's guilty plea. The state proceeded against Appellant based on complicity under R.C. 2923.03(A)(1) (soliciting or procuring).

{¶3} Appellant filed a motion to suppress any verbal and written statements made to law enforcement at his residence on June 17, 2015 and over the telephone on June 18, 2015. Although he signed a *Miranda* rights waiver form, he alleged he did not knowingly, voluntarily, or intelligently waive his *Miranda* rights. The detective who interviewed Appellant testified at the suppression hearing. On August 20, 2015, the court overruled the motion to suppress, finding there was no custodial interrogation.

{¶4} Appellant filed a motion in limine asking to exclude all evidence of his conversations with Horstman, except the specific evidence required to prove he told Horstman to insert her finger into the child's vagina and to prove she then did so. He claimed this contextual evidence was "other acts" evidence prohibited by Evid.R. 404(B) and was unfairly prejudicial under Evid.R. 403(A). His motion was denied preliminarily and again at trial.

{¶5} The case was tried to a jury on September 10 and 11, 2015. Horstman's boyfriend testified he lived with Horstman for eight years and was the

father of the victim. At the beginning of 2015, he became suspicious of Horstman's phone habits. He discovered her phone's screen lock password and looked through her phone. He observed sexually explicit conversations between Horstman and other men. (Tr. 150).

{¶6} One night in May of 2015, this witness discovered Horstman's new password, waited for Horstman to fall asleep, and drove away from the house with the phone so he would have time to view its contents. (Tr. 152-153). He accessed a social media application ("app") where he saw photographs of and sexual discussions about the victim. (Tr. 155-156). When Horstman noticed her phone was gone, she frantically called him using her mother's phone. The victim's father returned home in the early morning hours and went to sleep without telling Horstman what he found. He confronted her later, and filed a police report the next day. Before her phone was confiscated, Horstman deleted the app containing conversations which the police could not recover. However, the victim's father provided police with digital copies of a conversation he read. (State Exhibit 2). He explained how he took screenshots of a conversation on Horstman's phone, transmitted them to his own phone, and then deleted the screenshots on her phone. (Tr. 156-157, 161).

{¶7} At her May 15, 2015 interview, Horstman admitted she inserted her finger into the child's vagina. She disclosed she performed the act and photographed it on Appellant's request. She said she deleted the evidence. Her phone was sent to a task force dealing with internet crimes against children. A member of this task force testified how he was able to retrieve some deleted data stored in Horstman's phone; it was retrievable as it had not yet been overwritten by the phone's memory. (Tr. 180-182). He recovered five images, which were admitted at trial, including one showing penetration of the child's vagina by Horstman's finger and others depicting her progress leading up to the act. (State Exhibits 4, 5, 7, 8, 9). The task force member also extracted a brief series of text messages to and from Appellant's phone number. (Tr. 186-187); (State Exhibit 15).

{¶8} Horstman testified she pled guilty to the rape of her daughter and was expecting to receive a sentence of fifteen years to life. (Tr. 192). It was pointed out her maximum sentence was life without parole, and her plea was conditioned on full

cooperation in Appellant's case. (Tr. 259, 260). She confirmed testimony presented by the victim's father. She explained she met Appellant online in mid-February of 2015 on a dating website. They never met in person but regularly spoke on the phone, texted, and communicated online through a dating app and then through the social media app discovered by the victim's father. (Tr. 200, 204). Horstman regularly deleted communications so her boyfriend would not discover them. (Tr. 209, 238).

{¶9} Horstman said Appellant brought the topic of her daughter into their sexual conversations and she did not stop it because she liked the attention. (Tr. 208). Appellant referred to himself as "daddy," referred to Horstman as "Babygirl," and referred to the victim as "little babygirl." (Tr. 216). Horstman reviewed some messages Appellant sent to her, which were obtained from her phone by the victim's father. (Tr. 216-231); (State Exhibit 2). For instance, Appellant wrote: "Have you been playing with little babygirl pussy?"; "You miss playing with her pussy?"; "And I want to see little baby girl young pussy. In the am. Night"; "Keep them coming wear little babygirl. Want to see little babygirl young pussy"; and "You better have daddy some pics and video of u and little babygirl."

{¶10} Horstman then identified photographs she took at Appellant's request. There was one of the naked child on her lap. (Tr. 233). Other photographs showed her finger near or touching the child's vaginal area. She testified: "He said you can do better than that. Just stick your finger a little bit inside." (Tr. 235). She then put "a little bit" of her finger inside the child's vagina as requested by Appellant. (Tr. 235, 280). Addressing the photograph showing the penetration, which was recovered from her phone by law enforcement, Horstman admitted she took the photograph and later deleted it. (Tr. 236, 263, 265). She acknowledged Appellant's specific request for her to insert her finger was not contained in the conversation captured by the victim's father or recovered from her phone when police retrieved some of her deleted files. (Tr. 262). She also testified Appellant asked her to place a pacifier in her own vagina and give it to the baby; she said she pretended to do this. (Tr. 247-248).

**{¶11}** After the victim's father confronted her and she deleted the social media app from her phone, Appellant texted her to request she reactivate the app. She responded in the negative and Appellant replied, "You don't tell Daddy no." (Tr. 242). He also said: "where Daddy pics of little babygirl with no pants?" and "You better get Daddy some pics of you and lit * * *." (Tr. 241, 243, 279). When she sent him a picture of the child in clothing, he responded, "But no little babygirl young pussy." (Tr. 246). When Horstman told him her boyfriend was turning her in, Appellant called her and told her to dispose of her phone. (Tr. 247).

**{¶12}** A detective from the Belmont County Sheriff's Department testified to his interviews with Horstman and Appellant and to his investigation. He noted Appellant used his real name and birthdate in his screen name and used an actual photograph of himself as his profile picture. (Tr. 297-298). Upon finding Appellant's Chillicothe address from a database, the detective asked the local authorities to obtain a search warrant for evidence of child pornography. The detective accompanied the local officers as they executed the search warrant. A member of a child exploitation task force testified he was unable to retrieve deleted information from Appellant's phone, noting Appellant had a data-wiping app on a pre-paid phone. (Tr. 369, 371).

**{¶13}** During the search, the detective spoke to Appellant in the front yard (while the local officers ensured the residence was safe) and then in Appellant's bedroom. Appellant signed a *Miranda* rights waiver. The detective recorded the conversation using a recorder located in his pocket. (Tr. 310). He explained his interview technique of comforting the suspect and downplaying the suspect's offense. The detective testified to the progression of Appellant's statement, e.g., he admitted Horstman sent him unsolicited photographs of her daughter (which he deleted), he then said he did not think he asked her to do anything, and he soon revealed he asked her to put her fingertip inside her daughter. (Tr. 315-319, 351-352). When asked about a pacifier, Appellant disclosed he asked Horstman to put it in her own vagina before giving it to the baby. (Tr. 322, 357).

**{¶14}** Before the detective left, Appellant wrote a letter of apology while on his front porch. (State Exhibit 18). He apologized for asking for pictures of the baby,

stating he "just wanted to see how much she would do." (Tr. 327). The detective called Appellant at home the next day to confirm Appellant "asked" Horstman to insert her finger but did not order her (with threat of force). (Tr. 330, 344-345). This call was recorded as well.

{¶15} Appellant testified in his own defense. He confirmed meeting Horstman online in early 2015, after which they talked on the phone, texted, and communicated via social media. He admitted some of his sexual comments referred to the victim whom he called "little babygirl." (Tr. 395, 405). He denied asking for photographs of Horstman inserting her finger into the child's vagina. He acknowledged he asked for naked photographs of the child and noted the recovered messages did not show him asking Horstman to insert her finger into the child. (Tr. 404-405, 416-417). When asked why he confessed to the detective (by saying he asked Horstman to insert her fingertip into the victim's vagina), he said the detective wanted him to admit it and the detective suggested he would not be in trouble (since he never traveled to see the victim). (Tr. 396-397, 410). Appellant insisted Horstman performed the act and sent the photograph of the rape on her own, stating he did not want the pictures she "kept sending." (Tr. 416). Appellant's sister testified he generally tries to fit in during conversations and he is easily intimidated by authority. (Tr. 382-386).

{¶16} The jury found Appellant guilty of complicity to rape of a child under ten years of age. In a September 22, 2015 sentencing entry, the trial court sentenced Appellant to fifteen years to life in prison and labeled him a Tier III sex offender. Appellant filed a timely notice of appeal. His appointed counsel was replaced multiple times, and the period for submitting briefs closed at the end of 2016.

ASSIGNMENT OF ERROR ONE: ADMISSIBILITY OF EVIDENCE

{¶17} Appellant sets forth three assignments of error, the first of which contends:

"The trial court abused its discretion and committed reversible error when it permitted the introduction by the state of other crimes, wrongs, or acts to show proof of appellant's common plan or scheme in violation of Rules of Evidence 404(B) and 403."

**{¶18}** As aforementioned, Appellant filed a motion in limine asking to exclude all evidence except the specific evidence showing (1) Appellant asked Horstman to insert her finger in the child and (2) Horstman complied with the request. In other words, he did not believe other portions of the conversations between himself and Horstman should be admitted, including requests for naked photographs of the child. (Supp.Tr. 49-54). He argued his statements represented "other bad acts" under Evid.R. 404(B) and were unfairly prejudicial under Evid.R. 403(A). The motion in limine mentioned statements obtained in discovery but did not specifically state which statements were inadmissible. At the suppression hearing where this motion in limine was first discussed, the state suggested the conversations could fall under the exception in Evid.R. 404(B) regarding a plan or scheme. The trial court noted the motion was too broad and a ruling would depend on the context of the trial, the specific evidence sought to be admitted, and whether it was background information building up to this crime. (Supp.Tr. 55).

**{¶19}** Appellant renewed his motion in limine at trial. (Tr. 153-154, 311-312, 375). He stated the sexual conversations between Horstman and Appellant should not be admitted, except for the specific act in question. The trial court overruled Appellant's motion. (Tr. 154). Subsequently, the court provided a "clarifying" instruction to the jury explaining how some testimony was presented by the state "by way of background and the development of the relationship between" Horstman and Appellant, noting some evidence was not relevant to the issue of whether a rape was committed. (Tr. 227-228).

**{¶20}** On appeal, Appellant relies on Evid.R. 403(A), Evid.R. 404(B), and R.C. 2945.59. The cited statute provides:

> In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding

> that such proof may show or tend to show the commission of another crime by the defendant.

R.C. 2945.59. Pursuant to rule: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B).

{¶21} Notably, this list of exceptions is not exclusive. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 18. Additionally, the rule does not bar evidence which is intrinsic to the crime being tried. *See State v. Smith*, 49 Ohio St.3d 137, 139-140, 551 N.E.2d 190 (1990) (evidence of other acts is admissible if it tends to prove a specific element of the crime charged). So-called "other acts" are admissible if "they are so blended or connected with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged." *State v. Roe*, 41 Ohio St.3d 18, 23, 535 N.E.2d 1351 (1990), citing *State v. Wilkinson*, 64 Ohio St.2d 308, 317, 415 N.E.2d 261 (1980), quoting *United States v. Turner*, 423 F.2d 481, 483-484 (7th Cir.1970). In accordance, a court can admit other acts which form the immediate background of and which are inextricably related to an act which forms the foundation of the charged offense. *State v. Lowe*, 69 Ohio St.3d 527, 531, 634 N.E.2d 616 (1994).

{¶22} A decision admitting evidence of other acts into evidence under Evid.R. 404(B) is within the broad discretion of the trial court and evaluated under an abuse of discretion standard of review. *Morris*, 132 Ohio St.3d 337 at ¶ 19. Even if evidence is admissible under Evid.R. 404(B), the mandatory exclusion rule in Evid.R. 403(A) provides: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶23} The state referred to Appellant's scheme or plan, and the trial court suggested that much of the evidence involved the context of the offense. Appellant contends the trial court abused its discretion in permitting any evidence except the

specific testimony that he told Horstman to insert her finger and the specific direct evidence showing her compliance with his request. He generally claims the other evidence made him look bad and prejudiced his defense. He does not specifically review each item being contested.

{¶24} We begin by pointing out how the state must show the Appellant participated in the criminal intent of Horstman, and this intent may be inferred from the circumstances surrounding the crime and from the Appellant's conduct before, during, and after the offense. *State v. Johnson*, 93 Ohio St.3d 240, 245, 754 N.E.2d 796 (2001). In establishing complicity, the state sought to prove Appellant solicited the offense (which means "to seek, to ask, to influence, to invite, to tempt, to lead on, or to bring pressure to bear") or that he procured the offense (which means "to get, obtain, induce, bring about, motivate"). *Ohio Jury Instructions*, CR Section 523.03(A)(6)-(7). Furthermore, circumstantial evidence has the same probative value as direct evidence. *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001) (additionally, the defendant's intent can be gathered from the surrounding facts and circumstances).

{¶25} Therefore, the state was not limited to presenting the minimum evidence: the detective's testimony Appellant admitted telling Horstman to insert her fingertip in the child's vagina; Horstman's testimony Appellant told her to insert her finger in the child's vagina; and Horstman's testimony she then complied with this request. As "asking" is not the sole definition relevant to soliciting, the state was not limited to evidence Appellant asked Horstman to commit the offense.

{¶26} The one photograph clearly evidencing the act of penetration demonstrated the offense of rape committed by Horstman, the principal. The photographs immediately leading up to the act were not other acts of evidence. Horstman testified Appellant procured and solicited her to "do better" than merely placing her finger near and on the child's private parts and asked her to insert her fingertip. These photographs represent the crime in action.

{¶27} Appellant's progressive statements to the detective from receiving Horstman's unsolicited photographs, to asking for naked photographs of the child, to asking her to insert her fingertip were part of the investigation, in a case where the

defense claimed his final admission to police was untrue. His communications seeking naked photographs of *the victim* provide the context of the rape offense. The communications show the scheme, plan, or system he utilized. The progression and dynamics of the relationship between Appellant and Horstman also provide background. Statements such as "U don't tell daddy no" are indicative of this relationship. (It must be emphasized that the subject of the communications and of the child pornography was the victim who was raped during one of the pornographic photo shoots.)

{¶28} The evidence shows Appellant's intent and absence of mistake. The insertion request and rape occurred while Horstman was complying with Appellant's request for photographs of the child naked. Some evidence supports Appellant's statement that he wanted to see how much Horstman would do, such as the testimony concerning the pacifier. This request near or after the offense constitutes circumstantial evidence of his knowledge and involvement as does his request for Horstman to "ditch" her phone. Furthermore, the texts recovered from Horstman's phone by police connect Appellant's phone number with the crime, in turn connecting the photographs recovered from her phone to Appellant and connecting them all to the social media account recovered by the victim's father. The evidence identifies Appellant as the person Horstman met online and never met in person.

{¶29} Additionally, Appellant's requests for photographs and videos of the child's vagina were part of an online conversation discovered by the child's father and provided to police; this sparked the investigation. Within this conversation, Appellant asked Horstman: "Have you been playing with little babygirl pussy?" and "You miss playing with her pussy?" This confirms Appellant's knowledge, approval, and involvement. It also supports Horstman's commission of sexual acts against her daughter, which Appellant conceded was admissible. Such comments are inextricably related to the offense at issue. These comments combined with his continued requests to see the child's vagina and additional statements, such as "You better have daddy some pics and video of u and little babygirl," show his encouragement of Horstman's behavior. The evidence corroborates the mother's testimony that Appellant asked her to insert her fingertip after she placed her finger

near or on the child's vagina, as opposed to Appellant's theory of the case that Horstman sent unsolicited photographs and inserted her finger without his solicitation or procurement. In sum, the evidence is part of the operative facts of the case and not evidence of other acts unrelated to this crime.

{¶30} Regarding Evid.R. 403(A), "evidence against a defendant is meant to be prejudicial; it is only unfair prejudice that concerns the court and only unfair prejudice that can substantially outweigh the probative value." *State v. Agee*, 7th Dist. No. 12 MA 100, 2013-Ohio-5382, ¶ 40, citing Evid.R. 403(A). The five photographs showing Horstman's finger near, on, or in the victim's vagina were direct evidence of the rape. The photographs correspond to Horstman's movement and progress under Appellant's direction. There is no indication the evidence was admitted to appeal to the jurors' emotions as opposed to their intellect. *See State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 112. Of course, photographs showing the progress during the digital rape of a baby are disturbing. Yet, they fall under Appellant's acknowledgement that evidence demonstrating Horstman committed rape are admissible. We note the state identified six other photographs but withdrew these photographs during the admission of exhibits into evidence. (Tr. 374-375). As for photographs of Horstman's underwear or of her without a shirt, these created no discernible prejudice to Appellant's defense in a case where the jury was to determine Appellant's involvement in Horstman's digital rape of her own child, which she memorialized in a photograph.

{¶31} Moreover, the probative value of the evidence within Appellant's recovered communications was high and related to various aspects of the case. Since he and Horstman successfully deleted other communications, these were the last remnants of Appellant's communications concerning the victim's vagina and the assault on the child. Lastly, Appellant failed to show the probative value of the contents of his police interview was substantially outweighed by the danger of unfair prejudice. In sum, the trial judge reasonably found the probative value of the evidence (within the communications, photographs, and Appellant's statements to police) was not substantially outweighed by the danger of unfair prejudice. We

refuse to substitute our judgment for that of the trial court on these evidentiary matters.

**{¶32}** There is one final category of evidence that we will address even though Appellant makes general as opposed to specific arguments regarding the evidence. Horstman testified Appellant asked for a photograph of a 13 or 14 year old girl (who lived where Horstman said she was staying) "wearing less as you can" and told Horstman to find and wear the girl's underwear. (Tr. 219-221). Although within the same online conversation, these requests are less related to the offense than the portions of the communications referring to the victim. The trial court instructed the jury, in a "clarifying" instruction, the evidence was presented "by way of background and the development of the relationship between" Horstman and Appellant and was not relevant to the issue of whether a rape was committed. (Tr. 227-228). To the extent this evidence may have been excludable, prejudice to the defense is not apparent due to the plethora of other supporting evidence discussed throughout this opinion and the clarifying instruction by the trial court. For all of the foregoing reasons, Appellant's first assignment of error is overruled.

<u>ASSIGNMENT OF ERROR TWO: SUPPRESSION</u>

**{¶33}** Appellant's second assignment of error provides:

"The trial court erred in denying the appellant's motion to suppress evidence obtained from the Appellant on June 17 & 18, 2015."

**{¶34}** Appellate review of a suppression decision presents a mixed question of law and fact. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 100. Legal conclusions are reviewed de novo. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. However, factual decisions are afforded great deference. *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982). This is because the trial court is the fact-finder who occupies the best position from which to resolve factual questions, evaluate the credibility of witnesses, and weigh the evidence. *See State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992).

**{¶35}** Appellant's suppression motion asked the trial court to suppress his verbal and written statements to law enforcement, stating: "The defendant acknowledges signing a *Miranda* waiver form, but contends that the alleged waiver

was not knowingly, intelligently, and voluntarily made." The motion then stated the prosecution has the burden to prove the defendant's statements were not made in violation of his *Miranda* rights.

{¶36} Two days prior to the suppression hearing, Appellant filed a motion for funds for an expert to testify about Appellant's *Miranda* waiver. The motion noted the court advised at a prior hearing: the question of whether the defendant was in custody so as to require *Miranda* prior to questioning was the initial issue; and if *Miranda* was required, the issue would then become whether he knowingly, voluntarily, and intelligently waived his *Miranda* rights.

{¶37} As the suppression hearing began, the trial court explained the issue concerning the *Miranda* waiver need not be addressed until the custodial interrogation issue was addressed. (Supp.Tr. 2, 4). The court reviewed some law and listed ten factors it would consider in evaluating the totality of the circumstances as to whether a reasonable person would assess the situation as custodial. (Supp.Tr. 4-7). When asked how the June 18, 2015 phone conversation could be custodial, defense counsel advised it was the fruit of the poisonous tree, placing the focus on the June 17, 2015 interview conducted at Appellant's house. (Supp.Tr. 41).

{¶38} The state presented testimony by the investigating detective. He interviewed Appellant on June 17, 2015, accepted his written letter of apology that day, and called Appellant on June 18, 2015. The detective explained how he was present during the execution of the search warrant by the local authorities. He and a task member stood in the front yard and spoke to Appellant while the local authorities secured the residence before beginning their search for child pornography. (Supp.Tr. 12-14, 29). Appellant was not arrested or in handcuffs. The detective said he never touched Appellant and used no force or orders, noting he makes it a point to be very nice to suspects. (Supp.Tr. 24).

{¶39} The detective advised Appellant: he was there to talk about Peggy Horstman; Appellant was not under arrest; and he did not have to talk. The detective then presented Appellant with a *Miranda* rights form to look over while the detective read his rights to him. (Supp.Tr. 17). Appellant said he understood his rights and

signed the waiver form. (Supp.Tr. 17-18). The detective testified he performed this task as an "extra layer of caution." (Supp.Tr. 34-35).

**{¶40}** Approximately five minutes into the conversation, when the local authorities indicated the house was secure, the detective asked if there was a place they could "go and talk without embarrassing him in front of his parents * * *." (Supp.Tr. 14, 18-19). Appellant led the detective and the task force member to his upstairs bedroom. Although there was a door to reach the upstairs, the detective does not remember a door on Appellant's room itself; if there was a door, it was open during their talk. (Supp.Tr. 36-37). During this part of the conversation, the detective sat while Appellant stood; the detective invited Appellant to sit, as it made him uncomfortable to sit while Appellant was standing, but Appellant declined and remained standing. (Supp.Tr. 20, 29).

**{¶41}** Appellant did not appear to be under the influence of any substance and said he was not. (Supp.Tr. 20-21). The detective testified Appellant provided details which corroborated details known by the detective but which were not provided to Appellant by the detective. (Supp.Tr. 21-22). The detective asked if Appellant wanted to write a letter of apology, and Appellant said he did. (Supp.Tr. 22). He wrote the letter while they were on his front porch. The detective left without arresting Appellant. When asked by defense counsel, the detective acknowledged he told Appellant: "I am not saying you are not going to be in any trouble, but you're not going to jail." (Supp.Tr. 40). The detective's entire encounter with Appellant was recorded. (Supp.Tr. 17). The recording was not played at the suppression hearing.

**{¶42}** At the close of the suppression hearing, the parties agreed the evidence was submitted on the threshold issue. (Supp.Tr. 41-42). The trial court overruled the suppression motion finding there was no custodial interrogation. The court opined, "this was not even close to being custodial interrogation." (Supp.Tr. 42). The court then asked if this ruling made moot the motion for funds for an expert as to the *Miranda* waiver. Defense counsel answered in the affirmative and withdrew the motion in light of the court's ruling on the custodial interrogation. (Supp.Tr. 43).

**{¶43}** On appeal, Appellant claims the due process clause requires an inquiry into the voluntariness of his confession. He notes this is a separate inquiry from the

evaluation of whether he was subjected to a custodial interrogation, citing *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326 (2000). He argues the mere filing of a motion to suppress a confession requires the state to prove (by a preponderance of the evidence) the confession was voluntary, citing *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). However, *Lego* specifically explained, "*when a confession challenged as involuntary* is sought to be used against a criminal defendant at his trial, * * * the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary." (Emphasis added) *Id.* As Appellant emphasizes in his brief, the case also distinguishes a self-incrimination *Miranda* rights waiver issue from an issue with a due process violation for a coerced confession. *See id.* at 488.

{¶44} Appellant complains the detective led him to believe his actions would not amount to a serious level of trouble, which induced him to make incriminating statements. He concludes the totality of the circumstances show his confession was not voluntary. In support, he cites the Sixth District's *Arrington* case, which held promises of leniency or misstatements of the law on punishment meant a defendant's incriminating statements were not being freely self-determined and were involuntary and inadmissible "as a matter of law." *See State v. Arrington*, 14 Ohio App.3d 111, 470 N.E.2d 211 (6th Dist.1984). *But see State v. Robinson*, 9th Dist. No. 16421 (criticizing *Arrington* for concluding the confession was involuntary as a matter of law due to merely one factor). "A promise of leniency, while relevant to the totality-of-the-circumstances analysis, does not require that the confession be automatically suppressed." *State v. Bays*, 87 Ohio St.3d 15, 23, 716 N.E.2d 1126 (1999). In addition, "assuming that the officers lied to [the defendant], that would not necessarily make his statements involuntary. The use of deceit is merely * * * a factor bearing on voluntariness." *State v. Cooey*, 46 Ohio St.3d 20, 27, 544 N.E.2d 895 (1989).

{¶45} Even where *Miranda* warnings are not required (or were validly given), the due process clause is interpreted to mean a confession is involuntary if the totality of the circumstances show the defendant's will was overcome by the circumstances surrounding the confession. *See Dickerson*, 530 U.S. at 434 (the due process issue of voluntariness "depend[s] upon a weighing of the circumstances of

pressure against the power of resistance of the person confessing"); *State v. Eley*, 77 Ohio St.3d 174, 178 672 N.E.2d 640 (1996) (voluntary waiver of *Miranda* rights and voluntary giving of statement are distinct issues; both tests view the totality of the circumstances; test for voluntary confession is not triggered unless there are coercive police tactics). In evaluating a defendant's claim that his confession was involuntarily induced, the court considers the totality of the circumstances. *Bays*, 87 Ohio St.3d at 22.

{¶46} Relevant circumstances to consider include: the age and mentality of the defendant; the demeanor of the defendant during the interview, including whether he was under the influence of a substance; the defendant's prior criminal experience; the provision of *Miranda* rights; the length of the interrogation; the intensity of the interrogation; the frequency of interrogation if it occurred in stages; the existence of physical deprivation, mistreatment, or abuse; the existence of threats; and the existence of inducement. *See id.* at 22-23. The court is to weigh the factors to ascertain whether the factors negating voluntariness outweigh those pointing to voluntariness. *See id.* at 23.

{¶47} As for the totality of the circumstances presented to the court at the suppression hearing,[1] Appellant was standing in his front yard while a search warrant was being executed. He was not in handcuffs. Appellant did not give any indications he was under the influence of any substance. He was advised he was not under arrest. He was read his *Miranda* rights, and he signed a *Miranda* waiver. The detective was accompanied on the interview by a task force member; neither wore a uniform. The detective did not use physical force or touch Appellant. He in no way overpowered Appellant and was very friendly. When asked if there was somewhere more private to speak, Appellant led the detective to his upstairs bedroom. The bedroom door was not closed. The detective sat while he interviewed Appellant; Appellant stood for the interview. Appellant did not appear particularly nervous or emotional. The interview was not lengthy or intense. The defense elicited from the

---

[1] The interview was recorded. It was played for the jury at trial. However, it was not played by either side at the suppression hearing. The state presented the detective's testimony at the suppression hearing. Defense counsel mentioned he could play the recording if the detective disagreed with his characterization of the contents of the interview.

detective testimony that he told Appellant, "I'm not saying you are not going to be in any trouble, but you're not going to jail." (Supp.Tr. 40). Appellant was not arrested that day (as the officer advised him). We also note the indictment showed Appellant was 39 years old.

{¶48} At the beginning of the suppression hearing, the trial court mentioned various circumstances to be considered when evaluating the totality of the circumstances for custodial interrogations, including: location of interview at home versus a police station; arrested, handcuffed, or freedom to leave restricted in any other manner; threats or physical intimidation; verbal domination by police; and existence of police actions to trick or coerce the defendant into speaking. (Supp.Tr. 5-7). At the end of the hearing, the court found Appellant's interview was "not even close to being custodial interrogation." (Supp.Tr. 42).

{¶49} *Miranda* rights are derived from the Fifth Amendment's privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966). A valid waiver of *Miranda* rights is only required prior to a *custodial* interrogation. *Id.* at 479; *State v. Biros*, 78 Ohio St.3d 426, 440, 678 N.E.2d 891 (1997) (police are not required to administer *Miranda* warnings to everyone whom they question, even if the subject is a suspect). The question as to whether a custodial interrogation occurred involves an evaluation of "how a reasonable man in the suspect's position would have understood his situation." *Biros*, 78 Ohio St.3d at 440. The trial court believed the detective's testimony. No testimony was presented to counter the overriding impression conveyed by the detective's testimony that Appellant was not in custody during his interview. Considering the totality of the circumstances, the trial court's decision was within its province in assigning credibility and weighing the evidence at the suppression hearing.

{¶50} Nonetheless, Appellant does not contest the decision finding he was not in custody. Nor does he contend the *Miranda* waiver was involuntary (since any statements alleged to be inducements occurred after the waiver was signed). Appellant complains the trial court considered whether there was a custodial interrogation but did not consider whether his confession was voluntary.

**{¶51}** However, Appellant's suppression motion specifically raised whether his waiver of *Miranda* rights was valid. The court advised *Miranda* rights were not required when there is no custodial interrogation and said the hearing would initially proceed on this topic. As acknowledged in a subsequent motion for expert witness fees, this position of the trial court was conveyed to the defense before the day of the suppression hearing. The defense did not amend the suppression motion or file a new suppression motion. The time for doing so had not expired. *See* Crim.R.12 (C)(3),(D). *See also* Crim.R. 12(H) (trial court can permit the issue to be raised even after the time expired). The defense did not make a verbal motion to suppress the confession on the grounds it was involuntary or coerced by a promise he would not go to jail. (In addition, the defense withdrew the remainder of the suppression motion at the end of the suppression hearing.)

**{¶52}** Where a suppression motion is filed asserting a specific argument, a trial court does not commit error in failing to address a different argument. Likewise, the state cannot be characterized as having failed to meet its burden at a suppression hearing on an issue that was not raised as "[t]he State's burden of proof in a motion to suppress hearing is limited to those contentions that are asserted with sufficient particularity to place the prosecutor and court on notice of the issues to be decided." *State v. Diaz*, 5th Dist. No. 2016 CA 00113, 2017-Ohio-262, ¶ 23, citing *City of Xenia v. Wallace*, 37 Ohio St.3d 216, 218, 524 N.E.2d 889 (1988) ("The prosecutor must know the grounds of the challenge in order to prepare his case, and the court must know the grounds of the challenge in order to rule on evidentiary issues at the hearing and properly dispose of the merits.")

**{¶53}** A motion for a court order "shall state with particularity the grounds upon which it is made and shall set forth the relief or order sought. It shall be supported by a memorandum containing citations of authority * * *." Crim.R. 47 (and the court may allow an oral motion). "By requiring the defendant to state with particularity the legal and factual issues to be resolved, the prosecutor and court are placed on notice of those issues to be heard and decided by the court and, by omission, those issues which are otherwise being waived." *State v. Shindler*, 70 Ohio St.3d 54, 58, 636 N.E.2d 319 (1994) ("in order to require a hearing on a motion

to suppress evidence, the defendant must state the motion's legal and factual bases with sufficient particularity to place the prosecutor and court on notice of the issues to be decided"), citing, e.g., *State v. Desjardins*, 401 A.2d 165, 169 (Me.1979) ("[T]he suppression movant must articulate in his motion with sufficient particularity the specific reason on which he bases his claim that the seizure without warrant was illegal, so that the court will recognize the issue to be decided."). *See also State v. Shelby*, 4th Dist. No. 15CA20, 2016-Ohio-5721, ¶ 21 (defendant forfeited issue presented on appeal where motion to suppress claimed statement was involuntary due to intoxication, but appellate brief claimed statement was not voluntary because he decided to speak to law enforcement as a result of promises of leniency).

**{¶54}** In sum, Appellant specifically challenged his *Miranda* rights waiver in his suppression motion and at the suppression hearing. He did not contend his confession was involuntary due to police inducement via downplaying his offense and stating he would not go to jail. Accordingly, this assignment of error is without merit.

ASSIGNMENT OF ERROR THREE: SUFFICIENCY & WEIGHT

**{¶55}** Appellant's third assignment of error contends:

"The trial court erred in convicting the appellant of complicity to rape because there was insufficient evidence and/or the appellant's conviction was against the manifest weight of the evidence."

**{¶56}** Whether the evidence is legally sufficient to sustain a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). It is a test of adequacy. *Id.* An evaluation of a witness's credibility is not involved in a sufficiency review. *State v. Yarbrough*, 95 Ohio St.3d 227, 240, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79. Rather, the question is whether the evidence, *if believed*, is sufficient. *See id.* at ¶ 82; *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001). In other words, sufficiency involves the state's burden of production rather than its burden of persuasion. *See Thompkins*, 78 Ohio St.3d at 390 (Cook, J., concurring). In viewing a sufficiency of the evidence argument, the evidence and all rational inferences are evaluated in the light most favorable to the prosecution. *See State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). A conviction cannot be reversed on sufficiency grounds unless the reviewing court

determines that no rational juror could have found the elements of the offense proven beyond a reasonable doubt. *Id.*

{¶57} A person who is guilty of complicity in the commission of an offense is prosecuted and punished as if he were a principal offender. R.C. 2923.03(F). In accordance, complicity need not be charged in the indictment. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 181; R.C. 2923.03(F) ("A charge of complicity may be stated in terms of this section, or in terms of the principal offense."). The division of the complicity statute relied upon by the state provides: "No person, acting with the kind of culpability required for the commission of an offense, shall * * * Solicit or procure another to commit the offense." R.C. 2923.03(A)(1). As the jury was instructed, solicit means "to seek, to ask, to influence, to invite, to tempt, to lead on, to bring pressure to bear," and procure means "to get, obtain, induce, bring about, motivate." *Ohio Jury Instructions*, CR Section 523.03(A)(6)-(7). *See also State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 68.

{¶58} As previously stated, the state must show the defendant shared the criminal intent of the principal, and this intent may be inferred from the circumstances surrounding the crime and from the defendant's conduct before, during, and after the offense. *State v. Johnson*, 93 Ohio St.3d at 245. Additionally, circumstantial evidence and direct evidence inherently possess the same probative value. *See, e.g., In re Washington*, 81 Ohio St.3d 337, 340, 691 N.E.2d 285 (1998); *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus.

{¶59} Appellant's argument relates to his complicity; he does not contest the evidence showing the elements of rape (committed by Horstman upon the victim). Appellant argues the state did not prove he specifically asked Horstman to perform the act of inserting her finger into the victim's vagina. He notes the detective acknowledged they did not recover a message evidencing Appellant's alleged request. He also states his letter of apology does not show he solicited or procured Horstman to commit the rape as it was not specific.

{¶60} Considering Appellant's admission to the detective that he asked Horstman to insert her fingertip and Horstman's testimony that Appellant asked her to

insert her finger inside the child's vagina, the arguments made by Appellant do not relate to sufficiency of the evidence. In other words, the evidence, *if believed*, was sufficient to prove his complicity. *See Yarbrough*, 95 Ohio St.3d 227 at ¶ 82; *Murphy*, 91 Ohio St.3d at 543. Upon viewing the evidence in the light most favorable to the prosecution, a rational juror could have found the elements of the offense proven beyond a reasonable doubt. *See Goff*, 82 Ohio St.3d at 138.

**{¶61}** Even if a trial court's judgment is sustained by sufficient evidence, a defendant can argue the judgment is against the weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Id.* It is not a question of mathematics but depends on the effect of the evidence in inducing belief. *Id.* Weight of the evidence involves the state's burden of persuasion, whereas sufficiency involves the burden of production. *Id.* at 390 (Cook, J., concurring). The appellate court is to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, 78 Ohio St.3d at 387.

**{¶62}** This discretionary power of the appellate court is to be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.* Where a criminal case has been tried by a jury, only a unanimous appellate court can reverse on the ground that the verdict was against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 389, citing Section 3(B)(3), Article IV of the Ohio Constitution. The power of the court of appeals to sit as the "thirteenth juror" is limited in order to preserve the jury's role with respect to issues surrounding the credibility of witnesses and the weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387, 389.

**{¶63}** In other words, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio

St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.  The trier of fact occupies the best position to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor.  *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).  We therefore generally proceed under the premise that when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we do not choose which one we believe is more credible.  *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

{¶64} The jury heard and saw each witness testify on direct and on cross-examination.  It was the jury's job to evaluate any behavioral pauses or verbal/non-verbal disconnects during questioning.  The jury viewed the demeanor, gestures, voice inflections, and eye movements of Horstman and Appellant as they testified; the jury was able to evaluate whether any of these indicators tended to project an aura of truthfulness or untruthfulness.  It was within the province of the jury to find Horstman's story credible.  The jury could rationally disbelieve the story presented by Appellant when he testified at trial and believe Appellant told the detective the truth at the end of the interview and the next day over the phone.

{¶65} As aforementioned, in evaluating a weight of the evidence argument, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  *Lang*, 129 Ohio St.3d 512 at ¶ 220, citing *Thompkins*, 78 Ohio St.3d at 387.  Upon such review, we conclude this is not an exceptional case where the jury clearly lost its way and created a manifest miscarriage of justice.  We refuse to sit as the thirteenth juror in this case.  Appellant's final assignment of error is overruled.

{¶66} For all of the foregoing reasons, the trial court's judgment is affirmed.

Waite, J., concurs.

DeGenaro, J., concurs.