[Cite as *State v. Moorer*, **2019-Ohio-1090.**]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

VINCENT D. MOORER,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 17 MA 0054**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 13 CR 380(C)

**BEFORE:**
Cheryl L. Waite, Gene Donofrio, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Paul J. Gains*, Mahoning County Prosecutor and *Atty. Ralph M. Rivera*, Assistant Prosecuting Attorney, 21 West Boardman Street, 6th Floor, Youngstown, Ohio 44503, for Plaintiff-Appellee

*Atty. Nathan A. Ray*, 137 South Main Street, Suite 201, Akron, Ohio 44308, for Defendant-Appellant.

Dated: March 19, 2019

---

**WAITE, P.J.**

**{¶1}** Appellant Vincent D. Moorer appeals a March 22, 2017 Mahoning County Court of Common Pleas judgment entry convicting him of various crimes associated with a drug distribution organization. Appellant argues that the trial court's verdict is not supported by sufficient evidence and is against the manifest weight of the evidence. Appellant also argues that the trial court erroneously admitted evidence of text messages in violation of the Confrontation Clause. For the reasons provided, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

<u>Factual and Procedural History</u>

*The Organization*

**{¶2}** This case involves a million dollar drug distribution organization led by Appellant and DeWaylyn "Waylo" Colvin. Relevant to this appeal, the following individuals were also members of the organization: Melvin E. Johnson, Jr., Michael L. Austin, Jr., Hakeem Henderson, and Nahdia S. Baker.

**{¶3}** Appellant was the leader of a crack cocaine distribution organization. His organization later merged with a heroin distribution organization led by Colvin. The new group, jointly run by Appellant and Colvin, solely distributed heroin. Johnson, Austin, and Henderson were known as "triggermen" within the organization. The triggermen were responsible for the deaths of anyone who did not pay money owed to the organization or harmed or offended someone in the organization. Baker sold heroin for Appellant.

*Indictments*

**{¶4}** This matter arose from an April 11, 2013 indictment charging Colvin, Austin, and Henderson with various drug offenses. On May 16, 2013, the state filed a superseding indictment against Colvin, Austin, and Henderson. On May 21, 2015, the

state filed a second superseding indictment which added Appellant, Johnson, and Baker as defendants. Appellant was listed in fifteen of the twenty-seven counts.

{¶5} Appellant was charged with: the aggravated murder of Ryan Slade in violation of R.C. 2903.01(A), (F) with an attendant firearm specification in violation of R.C. 2941.145(A); the aggravated murder of Ke'Ara McCullough in violation of R.C. 2903.01(A), (F) with an attendant firearm specification in violation of R.C. 2941.145(A); four counts of attempted murder, felonies of the first degree in violation of R.C. 2903.02(A), (D) and R.C. 2923.02(A); four counts of felonious assault, felonies of the second degree in violation of R.C. 2903.11(A)(2), (D); one count of aggravated arson, a felony of the second degree in violation of R.C. 2909.02(A)(2), (B)(1)(3); one count of arson, a felony of the fourth degree in violation of R.C. 2909.03(A)(1), (B)(1)(2)(b); two counts of improperly discharging a firearm at or into a habitation, felonies of the second degree in violation of R.C. 2923.161(A)(1), (C), and engaging in a pattern of corrupt activity, a felony of the first degree in violation of R.C. 2923.32(A)(1), (B).

*September 18, 2012 – Ryan Slade and Ke'Ara McCullough*

{¶6} On September 18, 2012, Ryan Slade and Ke'Ara McCullough were shot to death while driving through an area in Boardman referred to as "Megan's Circle." (Tr. Vol I., p. 193.) McCullough was not a member of the organization. Slade and McCullough were dating; however, Slade also dated Appellant's girlfriend, Te'Aira Earvin.

{¶7} One of the state's key witnesses against Appellant was D.P., a member of the organization. D.P. testified that he received a call from Earvin who complained that Slade had slapped her while she was at a bar. She asked D.P. if he had the "heat" she had left at his house. (Tr. Vol. I, p. 300.) D.P. then called Appellant and informed him of

the call. According to D.P., Appellant told him that he needed to stop by D.P.'s house to retrieve the guns. Later, Appellant arrived at D.P.'s house and he left with two guns: a revolver and a .45 caliber firearm.

{¶8} D.P. testified that Appellant offered a significant amount of money in exchange for information on Slade and offered an additional amount to anyone who would kill him. Shortly thereafter, D.P. learned that Slade and McCullough had been killed. D.P. asked Appellant if he killed Slade and he responded, "no, I didn't. You know, like, I got people to handle it." (Tr. Vol II, p. 308.) On a separate occasion, Appellant told D.P. that he "put Mike Austin on it." (Tr. Vol. III, p. 480.) Austin was present at the time and confirmed that he "put [Slade] down." (Tr. Vol. III, p. 481.)

{¶9} E.M., who also dated Slade, testified that she was with Slade prior to the shooting. According to E.M., Slade's phone kept ringing and he rejected the calls. When she questioned him about the calls, he claimed that it was an out-of-town friend named "Mike" who wanted marijuana. E.M. ended up falling asleep before Slade left and awoke on receiving a phone call informing her of his death.

{¶10} A witness who lived in the neighborhood where the shooting took place testified that he heard approximately six gunshots outside his house. When he looked outside, he saw a black male running down the street carrying what looked to be a revolver.

{¶11} A second witness who lived in the neighborhood where the shooting took place testified that he saw a vehicle stopped in the backyard of a neighbor's house. He noticed bullet holes in the vehicle and called out to see if anyone needed help. When he did not receive an answer, he approached the vehicle and saw the two bodies slumped

over in the front and passenger seats. He called out to his brother and ordered him to call 911.

**{¶12}** Officer Greg Miller testified that it appeared that the shooting occurred in the street. The shooting caused the car to roll into the front lawn of a nearby house, travel between two houses, and then into a backyard before it came to rest against a garage.

**{¶13}** Andrew Chappell, who works for the Ohio Bureau of Criminal Investigations ("BCI") testified that eight shell casings were located at the scene. Seven of the casings were fired from a .45 caliber gun and one was fired from a .38 caliber gun. (Tr. Vol. II, p. 261.)

**{¶14}** According to Dr. Joseph Ohr, the coroner and medical examiner, both Slade and McCullough died as a result of gunshot wounds. Slade had been shot six times (a seventh bullet was found in Slade's pelvic area; however, it was determined to be an old wound). (Tr. Vol. II, p. 345.) Dr. Ohr testified that McCullough had three gunshot wounds. (Tr., Vol. II, p. 359.)

*March 20, 2014 – J.M.*

**{¶15}** On March 20, 2014, J.M. was shot near the intersection of South Avenue and Mathews Road. The state's key witness in this incident was M.P., a member of the organization. According to M.P., Appellant had placed a hit on J.M. because he had allegedly set up Dashonti Baker to be robbed. Baker is also a member of the organization. Appellant texted J.M. from Baker's phone to lure him to the South Avenue location. J.M. believed that he was meeting Baker at the location to complete a drug deal.

**{¶16}** Appellant drove a rented sports utility vehicle ("SUV") to a location near the South and Mathews Avenue intersection. M.P. testified that he sat in the front passenger

seat and Johnson sat in the backseat. Once they arrived at the intersection, Johnson exited the SUV armed with a gun. Appellant drove to a nearby car wash and parked in the parking lot where he waited. Johnson approached J.M., fired approximately four shots, and then ran back to the SUV.

{¶17} J.M. fell to the ground but made his way to the intersection of Cook and Evans Avenues before police officers found him. According to Officer Joseph O'Grady, J.M. had been shot three times. Det. Glenn Patton testified that he was able to secure J.M.'s phone at the scene and later retrieved the text messages sent from Baker's phone.

*May 24, 2014 – A.W., T.J., and J.L.*

{¶18} A.W. had a business and intimate relationship with Nahdia Baker. Baker also dated Appellant. According to M.P., Baker accused A.W. of owing significant debt to the organization which he attempted to pay with counterfeit money. M.P. suspected that Baker was lying about A.W.'s debt and he asked Appellant to allow him to investigate her claims before attempting to carry out the hit. Despite M.P.'s objections, Baker attempted to carry out the hit.

{¶19} Baker made two attempts to harm A.W. on the same day. The first attempt occurred at the home of the mother of at least one of A.W.'s children. A witness saw Baker approach a car that was parked in a driveway and put something on the hood of the car, causing it to catch fire. The car and the house were damaged. The second attempt occurred at the house of the mother of A.W.'s remaining children, T.J. A.W. was at T.J.'s house with a friend, J.L. When he received word of the fire, A.W. went to his truck where he waited for J.L. to join him. While he waited, a silver Malibu approached and a man exited and began firing into A.W.'s truck. A.W. managed to flee the truck and

escape. The shooter then turned and fired shots into the house where T.J. and J.L. were located. A.W. and T.J. identified Baker as the driver of the Malibu but could not identify the male shooter, who the state believed was Johnson.

{¶20} After the incident, M.P. confirmed his suspicion regarding Baker's claim. He learned that A.W. did not owe a debt to the organization. Rather, it was Baker who owed the debt. M.P. obtained text messages showing that Baker had asked A.W. to pay off an $8,000 debt she owed to Appellant. M.P. showed the messages to Appellant who became irate, beating Baker. Baker was arrested later that night at St. Elizabeth's hospital where she was receiving treatment for her injuries. Appellant offered A.W. $10,000 if he agreed not to implicate the organization in the shooting.

*Trial*

{¶21} Appellant and codefendant Johnson were tried together in a bench trial commencing on March 2, 2017. The seven-day trial concluded on March 9, 2017. The remaining defendants were severed from this trial.

{¶22} The trial court found Appellant guilty of: the aggravated murder of Ryan Slade and the attendant firearm specification; murder of Ke'Ara McCullough (the lesser included offense of aggravated murder) and the attendant firearm specification; attempted murder of J.M. and the attendant firearm specification; felonious assault of J.M. and the attendant firearm specification; two counts of improperly discharging a firearm at or into a habitation and the attendant firearm specification; attempted murder of A.W. and an attendant firearm specification; felonious assault of A.W. and the attendant firearm specification; felonious assault of T.J. and the attendant firearm specification; and engaging in a pattern of corrupt activity. The court found Appellant not guilty of: the

aggravated murder of Ke'Ara McCullough; aggravated arson; arson; the attempted murder of T.J.; the attempted murder of J.L.; and the felonious assault of J.L.

*Sentencing*

**{¶23}** The trial court sentenced Appellant to: life in prison without the possibility of parole for the aggravated murder of Ryan Slade; three years of incarceration for the attendant firearm specification; fifteen years to life for the murder of Ke'Ara McCullough with three years for the attendant firearm specification; eleven years for the attempted murder of J.M. with three years for the attendant firearm specification; eight years of incarceration for improperly discharging a firearm at or into a habitation with three years for the attendant firearm specification; eight years for improperly discharging a firearm at or into a habitation with three years for the attendant firearm specification; eleven years of incarceration for the attempted murder of A.W. with three years for the attendant firearm specification; eight years for the felonious assault of T.J. with three years for the attendant firearm specification; and eleven years of incarceration for engaging in a pattern of corrupt activity.

**{¶24}** Appellant's felonious assault convictions merged with the attempted murder convictions for purposes of sentencing and the state elected to proceed on the attempted murder convictions. The attendant firearm specifications were ordered to run prior to and consecutive to the correlating offenses. The trial court ordered the aggravated murder and murder convictions to run consecutively. The sentences for the remaining convictions were ordered to run concurrently.

ASSIGNMENT OF ERROR NO. 1

Case No. 17 MA 0054

APPELLANTS [SIC] CONVICTIONS SHOULD BE REVERSED BECAUSE THEY ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND BECAUSE THE EVIDENCE SUPPORTING THEM WAS INSUFFICIENT AS A MATTER OF LAW TO PROVE THE CONVICTIONS BEYOND A REASONABLE DOUBT WHICH DENIED APPELLANT HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL, UNDER THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES AND THE OHIO CONSTITUTION.

**{¶25}** Appellant argues that the following convictions are not supported by sufficient evidence and are against the manifest weight of the evidence: aggravated murder of Ryan Slade, murder of Ke'Ara McCullough, attempted murder of J.M., felonious assault of J.M., attempted murder of A.W., felonious assault of A.W., and felonious assault of T.J.

*Ryan Slade/Ke'Ara McCullough*

**{¶26}** Rather than presenting an argument as to the elements of the crime and whether evidence was presented on these elements, Appellant focuses his arguments on the credibility of the state's key witnesses, D.P. and M.P.

**{¶27}** Murder is defined within R.C. 2903.02(A): "No person shall purposely cause the death of another or the unlawful termination of another's pregnancy." Aggravated murder is defined within R.C. 2903.01(A): "No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy."

Case No. 17 MA 0054

**{¶28}** Under a complicity theory, a defendant can be prosecuted and punished as if he were a principal offender, even if the charge is stated in terms of the principal offense. R.C. 2923.03(F). "A person is complicit if, acting with the kind of culpability required for the commission of an offense, he aids or abets another in committing the offense." *State v. Henderson,* 7th Dist. No., 2018-Ohio-5124, ¶ 48, citing R.C. 2923.03(A)(2).

**{¶29}** Aiding and abetting exists where the defendant "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime * * *." *Id.*; *see also State v. Johnson*, 93 Ohio St.3d 240, 245, 754 N.E.2d 796 (2001). "Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed." *Id.*

**{¶30}** Pursuant to R.C. 2923.03(A):

No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

(1) Solicit or procure another to commit the offense;

(2) Aid or abet another in committing the offense;

(3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;

(4) Cause an innocent or irresponsible person to commit the offense.

**{¶31}** When aggravated murder is charged under a complicity theory, the actions are required to be taken "purposely, and with prior calculation and design." R.C. 2903.01(A). When determining "whether the defendant shared the intent of the principal, the surrounding facts and circumstances can be used to determine a defendant's intent."

*Henderson, supra,* at ¶ 48, citing *State v. Treesh,* 90 Ohio St.3d 460, 739 N.E.2d 749 (2001); *Johnson, supra.*

**{¶32}** D.P. provided the key testimony as to Appellant's involvement with the Slade/McCullough murders. D.P. testified that Te'Aira Earvin, Appellant's girlfriend, called him and complained that Slade slapped her. Earvin asked him if he still had the "heat" she had left at this house. (Tr. Vol. I, p. 300.) D.P. called Appellant and informed him of the situation. Appellant told D.P. that he needed to pick up the guns he left at D.P.'s house. The next day, Appellant arrived at the house and left with a .45 semiautomatic firearm and a revolver.

**{¶33}** At trial, the state theorized that Appellant lured Slade to the Megan's Circle location. The state pointed to E.M.'s testimony that someone named Mike had been calling Slade's phone all morning asking for drugs. According to the state, "Mike" is Mike Austin. Shortly after receiving these calls, Slade and McCullough arrived at the Megan's Circle location where two men approached his car and began shooting into the car from both sides. From this evidence, it is apparent that the shooters knew Slade would be arriving at the location. Thus, there is evidence that Slade was lured to the area and then ambushed by Appellant's triggermen.

**{¶34}** D.P. testified that Appellant offered a significant amount of money for the death of Slade. Shortly after D.P. heard this offer, he learned that Slade and McCullough had been killed. When he asked Appellant if he killed Slade, Appellant said, "no, I didn't. You know, like, I got people to handle it." (Tr. Vol. II, p. 308.) Similarly, M.P. testified that Appellant told him that he "put Mike Austin on it." (Tr. Vol. III, p. 480.) Austin was present at the time and confirmed that he "put [Slade] down." (Tr. Vol. IIII, p. 481.) M.P. also

Case No. 17 MA 0054

testified that Austin later expressed his anger over the fact that Appellant failed to pay him for the Slade hit. Austin threatened to kill Appellant over this non-payment.

**{¶35}** In addition to ordering the hit on Slade, Appellant drove the hitmen to the Megan's Circle location. M.P. testified that Appellant "said they went up there, Mike [Austin] got out, somebody else got out, didn't say no names. Said they ran up on the car and opened fired [sic]." (Tr. Vol. III, p. 481.) M.P. also testified that Appellant "did say that he was there because he seen [sic] what happened." (Tr. Vol. III, p. 482.)

**{¶36}** Andrew Chappell of BCI testified that shell casings found near the scene were discharged from a .45 semiautomatic firearm and a revolver. D.P. testified that Appellant retrieved a .45 semiautomatic firearm and a revolver from his house prior to the shooting. A witness saw a man running down the street with a revolver in his hand after hearing the gunshots.

**{¶37}** "Sufficiency of the evidence is a legal question dealing with adequacy." *State v. Pepin-McCaffrey*, 186 Ohio App.3d 548, 2010-Ohio-617, 929 N.E.2d 476, ¶ 49 (7th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.3d 541 (1997). "Sufficiency is a term of art meaning that legal standard which is applied to determine whether a case may go to the jury or whether evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Draper*, 7th Dist. No. 07 JE 45, 2009-Ohio-1023, ¶ 14, citing *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955). When reviewing a conviction for sufficiency of the evidence, a reviewing court does not determine "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Rucci*, 7th Dist. No. 13 MA 34, 2015-Ohio-1882, ¶ 14, citing *State v. Merritt*, 7th Dist. No. 09-JE-26, 2011-Ohio-1468, ¶ 34.

**{¶38}** In reviewing a sufficiency of the evidence argument, the evidence and all rational inferences are evaluated in the light most favorable to the prosecution. *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). A conviction cannot be reversed on the grounds of sufficiency unless the reviewing court determines no rational trier of fact could have found the elements of the offense proven beyond a reasonable doubt. *Id.*

**{¶39}** Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." (Emphasis deleted.) *Thompkins*, 78 Ohio St.3d at 387. It is not a question of mathematics, but depends on the effect of the evidence in inducing belief. *Id.* Weight of the evidence involves the state's burden of persuasion. *Id.* at 390 (Cook, J. concurring). The appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins* at 387. This discretionary power of the appellate court to reverse a conviction is to be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.*

**{¶40}** "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact is in the best position to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461

N.E.2d 1273 (1984). The trier of fact is free to believe some, all, or none of each witness' testimony and it may separate the credible parts of the testimony from the incredible parts. *State v. Barnhart*, 7th Dist. No. 09 JE 15, 2010-Ohio-3282, ¶ 42, citing *State v. Mastel*, 26 Ohio St.2d 170, 176, 270 20 N.E.2d 650 (1971). When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

{¶41} Based on these facts, there is sufficient competent and credible evidence that Appellant's actions in orchestrating Slade's death were purposeful. His actions in luring Slade to the location and ambushing him with two triggermen who fired shots at Slade as he drove the car down the street demonstrate that the killing was committed with prior calculation and design. There is also significant evidence that Appellant offered money for the death of Slade shortly before the killing.

{¶42} We note that Appellant questions the credibility of D.P. and M.P. While it is true that D.P. and M.P. each have criminal records and were part of the organization, their testimony tended to corroborate one another and remained consistent throughout trial. The record is devoid of any evidence to suggest that either witness was untruthful.

{¶43} In regard to the murder of Ke'Ara McCullough, again, there is sufficient competent and credible evidence supporting Appellant's conviction. As discussed within Slade's analysis, there is a plethora of evidence demonstrating the fact that Appellant orchestrated the events that led to her death. According to D.P., Appellant acknowledged that McCullough was inside the car with Slade. When D.P. expressed remorse that she was an innocent victim, Appellant responded, "it's f***ed up but she was there, you know."

(Tr. Vol. II., p. 308.) As such, there is evidence that McCullough was killed because she was a potential witness, thus the killing was purposeful.

**{¶44}** Accordingly, Appellant's convictions for the aggravated murder of Ryan Slade and the murder of Ke'Ara McCullough are supported by sufficient competent and credible evidence.

*A.W.*

**{¶45}** Appellant also challenges his attempted murder and felonious assault convictions regarding victim A.W. Appellant urges that neither A.W. nor T.J. could identify the shooter. The only witness that could identify the shooter identified Johnson, not Appellant. However, Appellant was convicted under a complicity theory, thus the identity of the shooter is irrelevant.

**{¶46}** Attempted murder involves conduct that, if successful, would result in purposely causing the death of another. R.C. 2903.02(A); R.C. 2923.02(A). Again, Appellant was convicted under a complicity theory. When attempted murder is charged under a complicity theory, the culpability is "purposely."

**{¶47}** R.C. 2903.11(A), the felonious assault statute, states that "[n]o person shall knowingly do either of the following: (1) Cause serious physical harm to another or to another's unborn; (2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."

**{¶48}** According to M.P.'s testimony, Appellant put a "hit" on A.W. after hearing Nahdia Baker's claims that he owed the organization a significant debt. T.J., who is A.W.'s girlfriend, testified that she spoke to Baker on the phone and Baker stated: " [A.W.] better pay Vinnie, pay Vinnie his money because I know what he's capable of." (Tr. Vol.

IV, p. 766.) Baker then sent a series of text messages stating: "[t]hey going to learn the hard way," "[i]t's cool. I'm done giving these b***es warnings," "[a]nd [A.W.] think this dude playing. Like do he know Vinnie will be there in two days," "[h]e been owing me for a f***king month," "[t]ell that b***ch [T.J.] if [A.W.] don't pay me my motherf***ing money that they gonna wish he had. I can't even pay my rent because he ain't paid me," and "I'm tired of being nice. I been holding this nigga back for three weeks now. It's time for bills to get paid. I don't give a f***ck about nobody -- in bold print -- or they kids because obviously they don't give a f***ck about mines [sic]." (Tr. Vol. IV, pp. 767-769.) These messages were sent the day before the A.W. shooting.

{¶49} In the days after the shooting, Appellant learned that Baker lied about A.W.'s debt. Appellant called A.W. and characterized the shooting as a "misunderstanding" and offered him $10,000 if he agreed not to implicate the organization in the shooting.

{¶50} According to R.C. 2923.03,

(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

(1) Solicit or procure another to commit the offense;

(2) Aid or abet another in committing the offense;

(3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;

(4) Cause an innocent or irresponsible person to commit the offense.

{¶51} To solicit "means 'to seek, to ask, to influence, to invite, to tempt, to lead on, or to bring pressure to bear.' " *State v. Smith*, 7th Dist. No. 15 BE 0064, 2017-Ohio-2708,

¶ 24, citing Ohio Jury Instructions, CR Section 523.03(A)(6)–(7). To procure "means 'to get, obtain, induce, bring about, motivate.' " *Id.* "[T]o support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *Johnson*, *supra,* at 245-246.

{¶52} It is clear from this record that Appellant ordered the hit on A.W. In addition to M.P.'s testimony, the phone call and text messages involving Baker demonstrate that Appellant was upset that A.W. allegedly owed money to the organization and that Appellant would become involved if the debt was not immediately paid. There is also evidence that Appellant became upset with Baker for lying as it implicated the organization in an unnecessary shooting. Appellant attempted to pay A.W. a significant amount of money to cover his actions. Thus, there is evidence that Appellant solicited Baker and the shooter to kill A.W. and there is evidence that he aided and abetted Baker and the shooter. As such, Appellant's attempted murder and felonious assault convictions are supported by sufficient competent and credible evidence.

*T.J.*

{¶53} T.J. was inside the home at the time Baker and the shooter attempted to kill A.W. After the shooter fired shots into the truck, he turned and fired shots into the house where T.J. was located. Bullet holes were found inside the house. T.J. testified about the text message exchange she had with Baker, which are described within A.W.'s analysis. It is clear that the shooter who attempted to kill A.W. also fired shots in the direction of T.J. It is also clear that Baker had threatened T.J. if A.W. did not pay his

alleged debt to Appellant as evidenced by the text messages. Thus, the evidence shows that Appellant was complicit in Baker and the shooter's attempt to cause physical harm to T.J. by means of a deadly weapon, in this case, a rifle.

*J.M.*

**{¶54}** Appellant was also convicted of the attempted murder and felonious assault of J.M. under a complicity theory. According to M.P., Appellant ordered a hit on J.M. because J.M. allegedly set up Dashonti Baker to be robbed. Baker is a member of the organization. M.P. testified that Appellant used Baker's phone to text and lure J.M. to the South Avenue location on the premise of a drug deal. Appellant directed J.M. to a specific intersection, South Avenue and Mathews Road. J.M. was led to believe that he was exchanging text messages with Baker and expected to meet Baker, not Appellant.

**{¶55}** According to M.P., Appellant drove an SUV that had been rented. M.P. sat in the front passenger seat and Johnson sat in the backseat. Johnson exited the vehicle armed with a gun and approached J.M. Appellant then drove to a nearby car wash and parked the vehicle. Video from the car wash's surveillance system confirmed that a SUV matching the description M.P. provided waited in the parking lot for a few minutes and then drove away. M.P. testified that he heard gunshots and then saw J.M. fall to the ground. Johnson then ran towards the SUV, which picked him up before driving away from the scene. Once inside the vehicle, Johnson told M.P. and Appellant that J.M. had asked him for a cigarette which gave him an opportunity to pull out his gun and shoot him. The text messages between J.M. and Appellant and the car wash surveillance video were admitted into evidence.

{¶56} A witness who lived near the car wash testified that she heard several gunshots and looked out her window and saw two men near the car wash. She went to her front porch and saw a SUV leave the car wash parking lot and pick up one of the men before driving down the street.

{¶57} There is no question that Appellant's actions were purposeful. There is evidence that Appellant ordered a hit on J.M. as retaliation for the Baker robbery. Appellant used Baker's phone to make J.M. believe that he would be meeting Baker at the South Avenue location to complete a drug deal. Appellant's purpose was to lure J.M. using the element of surprise and ambush him. Appellant drove Johnson to the location and waited in a parking lot as Johnson attempted to carry out the hit. Appellant then left the scene with J.M. laying, injured, in the street. From this evidence, it is clear that Appellant intended to cause J.M.'s death. For these reasons, there is sufficient competent and credible evidence to support Appellant's attempted murder and felonious assault convictions.

{¶58} Accordingly, Appellant's first assignment of error is without merit and is overruled.

## ASSIGNMENT OF ERROR NO. 2

THE ADMISSION OF UNAUTHENTICATED CELL PHONE TEXT MESSAGES VIOLATES THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

{¶59} Appellant contends that the trial court erroneously admitted text messages from the phone of J.M., who did not testify at trial. Appellant contends that the text messages are testimonial in nature. Because J.M. did not testify and there is no indication

that he was unavailable to testify, Appellant argues that admission of the messages violates the Confrontation Clause. Appellant argues that, even if the messages are considered nontestimonial, they were not authenticated.

**{¶60}** In responsive, the state argues that the text messages are nontestimonial and were authenticated by Det. Glenn Patton and M.P.'s testimony. Thus, the state contends that admission of the text messages does not violate the Confrontation Clause.

**{¶61}** The Confrontation Clause affords a criminal defendant the right "to be confronted with the witnesses against him." U.S. Constitution, Sixth Amendment. Pursuant to the United States Supreme Court, the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' " *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The prominent issue is "what constitutes a testimonial statement: 'It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.' " *State v. Shaw,* 2013-Ohio-5292, 4 N.E.3d 406 ¶ 39 (7th Dist.), citing *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 2273, 165 L.Ed.2d 224 (2006).

**{¶62}** Det. Patton testified that he secured J.M.'s phone when officers found him laying injured on the street. Det. Patton said that he used a program called "Cellbrite" to read and extract the text messages from the phone. Initially, Det. Patton was unable to determine who owned the phone that sent the text messages because the messages were sent from a "TracFone." However, the Cellbrite program revealed the phone number of the TracFone.

{¶63} Det. Patton discovered the owner of the TracFone through his investigation. He found a text message in J.M.'s phone asking someone for "Sweat's" phone number. Sweat is Dashonti Baker's nickname. The text message recipient responded "(330)942-5193," which is the number associated with the TracFone. (Trial Tr. Vol. III, pp. 625, 633.) Thus, Det. Patton was able to connect Baker's phone to the text messages. The following text messages were sent between Baker and J.M.'s phones during the time period leading up the shooting.

[J.M.] Yo wut up

[Baker] Im b ready n lik 20

[J.M.] Kool

[Baker] Where u at Im n traffic

[J.M.] I'm like in boardman by sparkles

[Baker] N dem partments? Im klose

[J.M.] Yea but up more on. Afton and cook

[Baker] 5min

[J.M.] Ok

[J.M.] Yo

[Baker] My bad Im n route had 2 make kouple moves

[J.M.] Ight 4sho

[J.M.] Bout how J.L. fam

[J.M.] Dats kool u comen 4sho I can try 2 come down south ave but I'm walkn

[J.M.] ??

Case No. 17 MA 0054

[Baker]  Koo wat side you walkin 0n im bouta pass jqs

[J.M.]  Left or right wut side should i [sic]

(Exh. 570.)

{¶64}  We have previously acknowledged that "photographs of the text messages can be admissible as an admission by a party-opponent under Evid.R. 801(D)(2)(a) if they are properly authenticated."  *Shaw* at ¶ 43.  The first part of the rule requires the text message to be an admission of a party opponent.  Pursuant to Evid.R. 801(D)(2), an admission by a party opponent is a

> [S]tatement [that] is offered against a party and is (a) the party's own statement, in either an individual or a representative capacity, or (b) a statement of which the party has manifested an adoption or belief in its truth, or (c) a statement by a person authorized by the party to make a statement concerning the subject, or (d) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (e) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy.

{¶65}  The specific issue, here, is whether text messages sent by Appellant from Baker's phone constitutes a party opponent admission.  The existing caselaw addresses only whether a text message sent from a defendant's phone constitutes a party admission.

{¶66}  A case arising from the Eighth District provides guidance.  See *State v. Roseberry*, 197 Ohio App. 256, 2011-Ohio-5921, 967 N.E.3d 233 (8th Dist.).  In

*Roseberry*, the victim wrote out text messages by hand that she had sent to and received from the defendant. The messages were later accidently deleted from the phone. The handwritten text messages were a verbatim recitation of the messages but did not indicate the sender or recipient of the messages. Two groups of text messages were admitted at trial. The victim read the first group of messages and specified who sent and received each message. A detective without personal knowledge of who sent and received the message provided the sole testimony as to the second group of messages.

**{¶67}** On appeal, the Eighth District held that the text messages to which the victim provided testimony regarding the contents, sender, and recipient were admissible pursuant to Evid.R. 801(D)(2). However, because the detective did not know the defendant's phone number or who sent and received the text messages, the text messages from the second group were inadmissible hearsay. The Eighth District focused its analysis on whether the person testifying about the text messages had personal knowledge of the contents and could identify the sender and recipient of the messages. *Id.* at ¶ 75.

**{¶68}** *Roseberry* is distinguishable from the instant matter as those text messages were sent by the defendant from his own phone. However, the court's reasoning provides guidance. The *Roseberry* court focused on the fact that the witness had personal knowledge of the messages and was able to testify who sent and received each text message. In this case, Det. Patton, who had personal knowledge of the number associated with the TracFone, provided testimony as to the senders and recipients of the text messages. The Cellbrite printout of the text messages specified the phone number associated with the text messages and who sent and received each message.

Additionally, M.P. testified that he was present when Appellant texted J.M. (Tr. Vol. III, pp. 491-492.) Appellant read the contents of the text message exchange as it occurred to M.P. and Johnson. (Trial Tr. Vol. III, p. 491.)

**{¶69}** The only reason the second group of text messages were deemed inadmissible in *Roseberry* was because the detective testifying as to their content did not have independent knowledge of the identity of the sender and recipient of the text messages. Here, Det. Patton's testimony and the Cellbrite printout demonstrated the recipient and sender's phone numbers. M.P. also provided testimony as to who sent and received the messages and additionally provided testimony as to the content of the messages. The trial court correctly pointed out that this particular issue presents an issue of credibility rather than admissibility.

**{¶70}** It must next be shown that the text messages were authenticated. Appellant cites to *State v. Hood*, 135 Ohio St.3d 137, 2012-Ohio-6208, 984 N.E.2d 1057. In *Hood*, the Ohio Supreme Court held that phone records between conspirators were inadmissible because those records were not authenticated pursuant to Evid.R. 803(6). *Id.* at ¶ 41. However, the instant case is distinguishable from *Hood*. Here, the state provided a printout of the text messages using the "Cellbrite" tool which extracted the content of the text messages and displayed the phone number for both the sender and recipient. Cellbrite allows investigators to extract text messages from a phone without requesting phone records from the provider. (Trial Tr. Vol. III, p. 611.) Because the text messages were taken directly from the phone itself during the criminal investigation without subpoenaing the records from the provider, the authentication requirements of Evid.R.

803(6), do not apply, here.  See *State v. Norris,* 2016-Ohio-5729, 76 N.E.3d 405 (2d Dist.).

**{¶71}** "[T]he threshold standard for authenticating evidence pursuant to Evid.R. 901(A) is low, and 'does not require conclusive proof of authenticity, but only sufficient foundational evidence for the trier of fact to conclude that * * * [the evidence] is what its proponent claims it to be.' "  *State v. Inkton,* 2016-Ohio-693, 60 N.E.3d 616, ¶ 73 (8th Dist.), quoting *State v. Easter*, 75 Ohio App.3d 22, 25, 598 N.E.2d 845 (4th Dist.1991). Authenticity may be established through circumstantial evidence.  *Id.*  Pursuant to Evid.R. 901(B)(1), the authentication requirement can be satisfied by the "[t]estimony of a witness with knowledge.  Testimony that a matter is what it is claimed to be."  Here, the text messages were authenticated by M.P.  As previously discussed, he testified that he was with Appellant when the text messages were sent and that Appellant read the contents of the texts to him and Johnson as the conversation occurred.  As such, M.P. had personal knowledge of the contents of the text messages.

**{¶72}** While Appellant attacks M.P.'s credibility, a surveillance video from the car wash confirms that a SUV matching the description given by M.P. pulled into the parking lot around the time of the shooting and left shortly thereafter.  Additionally, a witness who lived near the car wash testified that she heard several gunshots and looked out of her window and saw two men near the car wash.  She went to her front porch saw a SUV pull out of the car wash and pick up one of the men before speeding down the street.  M.P.'s description of the SUV is consistent with both the surveillance video and the witness' description.  Thus, M.P.'s testimony is corroborated by other evidence.

**{¶73}** Even if the text messages were improperly admitted, any error would be harmless. The testimony of M.P. provided the basis for Appellant's conviction. He testified that Appellant ordered a hit on J.M. for retaliation for the Baker robbery. He testified that Appellant drove Johnson to the South Avenue location where Johnson exited the SUV with a gun and approached J.M. He then heard gunshots, saw J.M. fall to the ground, and then saw Johnson run back to the SUV. Once inside the SUV, Johnson informed M.P. and Appellant that J.M. asked him for a cigarette giving him an opportunity to reach for his gun and shoot him. After picking up Johnson, Appellant drove away from the scene. As previously discussed, M.P.'s testimony is corroborated by other evidence. Thus, there is sufficient evidence to support Appellant's conviction even without the text messages. See *State v. Williams,* 6 Ohio St.3d 281, 290, 452 N.E.2d 1323 (1983) ("Where evidence has been improperly admitted in derogation of a criminal defendant's constitutional rights, the admission is harmless 'beyond a reasonable doubt' if the remaining evidence alone comprises 'overwhelming' proof of defendant's guilt.") Accordingly, Appellant's second assignment of error is without merit and is overruled.

## Conclusion

**{¶74}** Appellant argues that the trial court's verdict is not supported by sufficient evidence and is against the manifest weight of the evidence. Appellant also argues that the trial court erroneously admitted evidence of text messages in violation with the Confrontation Clause. For the reasons provided, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

Donofrio, J., concurs.

Robb, J., concurs.

Case No. 17 MA 0054

———————————————

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure.  It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

**NOTICE TO COUNSEL**

**This document constitutes a final judgment entry.**