[Cite as *State v. Panzeca*, 2020-Ohio-326.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | CASE NO. CA2019-03-023 |
| Appellee, | : | O P I N I O N<br>2/3/2020 |
| | : | |
| - vs - | : | |
| | : | |
| AMY PANZECA, | : | |
| Appellant. | : | |


CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. CA2019-03-023


David P. Fornshell, Warren County Prosecutor, Kirsten A. Brandt, 520 Justice Drive, Lebanon, Ohio 45036, for appellee

Ostrowski Law Firm Co., L.P.A., Andrea G. Ostrowski, 20 South Main Street, Springboro, Ohio 45066, for appellant


**S. POWELL, J.**

{¶ 1}   Appellant, Amy Lea Panzeca, appeals her conviction in the Warren County Court of Common Pleas after the trial court found her guilty of two counts of permitting drug abuse and one count of endangering children.  For the reasons outlined below, we affirm.

{¶ 2}   On August 14, 2017, the Warren County Grand Jury returned an indictment

charging Panzeca with two counts of permitting drug abuse in violation of R.C. 2925.13(B), both fifth-degree felonies. The indictment also charged Panzeca with one count of endangering children in violation of R.C. 2919.22(A) and one count of contributing to the unruliness or delinquency of a child in violation of R.C. 2919.24(B)(2), both first-degree misdemeanors. The charges arose after a drug task force found evidence that Panzeca had permitted her then 15-year-old son, A.P., to possess, use, and traffic drugs out of her Warren County home. For his part, A.P. was adjudicated a delinquent child for having committed acts that if charged as an adult would constitute several felony drug abuse offenses: trafficking in drugs in violation of R.C. 2925.03(A)(1), a third-degree felony if committed by an adult; possession of controlled substances in violation of R.C. 2925.11(A), a fourth-degree felony if committed by an adult; and possession of a controlled substance in violation of R.C. 2925.11(A), a fifth-degree felony if committed by an adult. This court affirmed A.P.'s adjudication on direct appeal in *In re A.P.*, 12th Dist. Warren No. CA2018-01-006, 2018-Ohio-3423.

{¶ 3} On December 21, 2017, Panzeca moved the trial court to order an assessment to determine whether she was statutorily eligible for intervention in lieu of conviction ("ILC"). Panzeca supported her motion for ILC by alleging she had an alcohol problem that was a factor leading to the charges brought against her. The trial court granted Panzeca's motion and ordered Panzeca to submit to an ILC assessment. Approximately one month later, the trial court held a hearing on Panzeca's motion for ILC. During this hearing, the state argued that Panzeca was not statutorily eligible for ILC since there was "no connection to how the defendant knowingly permitted her house to be used for drug offenses based on her alcohol use" as required by R.C. 2951.041(B)(6). The trial court agreed and found that Panzeca was not statutorily eligible for ILC since it was "not enough for her to just be in general, either an alcoholic or drug dependent or to have a mental

illness. I have to find that it was a factor in the commission of this offense[.]"

{¶ 4} After denying Panzeca's motion for ILC, as well as Panzeca's motion to suppress, the matter was tried to the bench on January 28 and 29, 2019. At trial, the trial court heard testimony from ten witnesses for the state.[1] One of those witnesses, Adam Stadler, testified that Panzeca's son, A.P., was a "drug dealer" who had frequently sold him drugs while Panzeca was "standing right there watching it happen." Explaining how these drug deals occurred even though Panzeca was standing there watching, Stadler testified, "I mean you could see it in his hand. It's not like he tried to hide anything." Explaining further, Stadler testified that A.P. "never hid it from his mom. It's like he's just passing me acid. I'm trading money. She's standing right there." When asked how many times these drug deals occurred while in Panzeca's presence, Stadler testified that A.P. sold him drugs in front of Panzeca more times than he could count.

{¶ 5} Stadler testified that Panzeca had also witnessed A.P. using drugs more times than he could "count on his fingers." Stadler testified that this was because A.P. used drugs "a lot" and "didn't hide it at all." Stadler testified that Panzeca had even been in A.P.'s basement bedroom "when there was like 18 or 20 people in the basement partying and you could tell they were off on something." As Stadler testified:

> Well, when you're on acid your pupils get huge and it's really easy to see even as far away as you are sitting from me. And then there's also people just saying really weird things. And you have psychedelic lights going on, psychedelic music too. It's kind of hard not [to] think something's going on.

{¶ 6} Stadler also testified to the following exchange between himself and Panzeca:

> We were in her kitchen and if you look in the basement there was – I think they fixed the holes in the wall, there used to be holes in the walls in the basement. And I asked where those holes in the wall came from. And she said it had come from Xanax. And she didn't want Xanax in the house anymore, but

---

1. We note that Panzeca did not take the stand nor did Panzeca offer any witnesses in her defense.

she was okay with other things. She didn't explicitly say what those other things were, but that's what she said.

{¶ 7} Stadler testified that he had additionally heard Panzeca say "she'd rather people use – you know, be inside using drugs in the house than outside getting hurt." Stadler testified that he had also witnessed A.P. use Panzeca's credit card to purchase Bitcoin off the Internet.[2] Stadler testified that he then witnessed A.P. use the Bitcoin he bought with Panzeca's credit card to buy drugs from the "dark web."[3] When asked if he had ever heard Panzeca comment about A.P. using Bitcoin to purchase drugs off the Internet, Stadler testified that Panzeca "did mention how it was a lot more discreet and safer because, you know, you're getting it from home, you're not getting it from the street."

{¶ 8} After both parties rested, the trial court returned a verdict finding Panzeca guilty of two counts of permitting drug abuse and one count of endangering children. In so holding, the trial court stated:

> I think when I evaluate the case as a whole, then there is overwhelming circumstantial evidence that you knew what was going on in your house. And that this was – I mean this was a terrible form of this offense. I cannot think of a worse form of this offense than what was going on in the Panzeca house through the time of this indictment.

{¶ 9} On February 21, 2019, the trial court held a sentencing hearing and sentenced Panzeca to three years of community control, the conditions of which required Panzeca to serve 180 days in jail. In reaching this decision, the trial court determined that ordering Panzeca to serve 180 days in jail as a condition of her community control was "called for in

---

2. Bitcoin is "an anonymous, decentralized form of electronic currency that exists entirely on the Internet and not in any physical form." *United States v. Murgio*, 209 F.Supp.3d 698, 704 (S.D.N.Y.2016), citing Kevin V. Tu & Michael W. Meredith, *Rethinking Virtual Currency Regulation in the Bitcoin Age*, 90 Wash L. Rev. 271, 277 (2015).

3. "The 'dark web' is a term used to refer to a collection of websites on an encrypted network that cannot be found by using traditional search engines or visited by using traditional Internet browsers." *State v. Liming*, 12th Dist. Clermont Nos. CA2018-05-028 and CA2018-05-029, 2019-Ohio-82, ¶ 3, fn. 2.

this case" since the facts in this case presented were "probably the worse (sic) possible form of this offense." The trial court also found that ordering Panzeca to serve 180 days in jail was warranted given the fact that "what was going on in [her] house, was terrible. It was terrible for [her], it was terrible for [her] son, it was terrible for the people that were there, with [her] son," and "[i]t was terrible for the community and the people in that community." After the trial court issued its sentencing decision, Panzeca moved the trial court to stay her sentence pending appeal. The trial court granted Panzeca's motion. Having had her sentence stayed by the trial court, Panzeca now appeals her conviction, raising six assignments of error for review.

{¶ 10} Assignment of Error No. 1:

{¶ 11} THE TRIAL COURT ERRED WHEN IT FOUND APPELLANT GUILTY.

{¶ 12} In her first assignment of error, Panzeca argues her conviction was not supported by sufficient evidence. We disagree.

{¶ 13} Whether the evidence presented is legally sufficient to sustain a verdict is a question of law. *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Intihar*, 12th Dist. Warren CA2015-05-046, 2015-Ohio-5507, ¶ 9. The relevant inquiry is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. This test "requires a determination as to whether the state has met its burden of production at trial." *State v. Boles*, 12th Dist. Brown No. CA2012-06-012, 2013-Ohio-5202, ¶ 34, citing *State v. Wilson*, 12th Dist. Warren No. CA2006-01-007, 2007-Ohio-2298, ¶ 33. When

evaluating the sufficiency of the evidence, this court must view all evidence in the light most favorable to the state and "defer to the trier of fact on questions of credibility and the weight assigned to the evidence." *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, ¶ 132.

{¶ 14} Panzeca initially challenges her conviction for two counts of permitting drug abuse in violation of R.C. 2925.13(B). Pursuant to that statute, no homeowner shall knowingly permit his or her home "to be used for the commission of a felony drug abuse offense by another person." Panzeca claims the trial court erred by finding her guilty of permitting drug abuse since those charges were based on her son A.P.'s conduct that led to his adjudication as a delinquent child rather than an adult's conviction for a felony drug abuse offense. Therefore, because a juvenile adjudication as a delinquent child is not the same as an adult felony conviction, and because juveniles are generally not charged and convicted of criminal offenses, Panzeca argues the state provided insufficient evidence to prove she knowingly permitted her home "to be used for the commission of a felony drug abuse offense by another person." We find no merit to Panzeca's claim.

{¶ 15} The permitting drug abuse statute, R.C. 2925.13(B), does not require the state to prove the person using the offender's home for the commission of a felony drug abuse offense was convicted of that offense in order to secure a permitting drug abuse conviction. The statute also does not require the state to prove the person using the offender's home for the commission of a felony drug abuse offense was an adult. The statute instead merely requires the offender to have knowingly permitted his or her home "to be used for the *commission of* a felony drug abuse offense by *another person*." (Emphasis added.) Juveniles, who are considered "persons" under the Ohio Revised Code, are routinely found to have engaged in conduct that would constitute the commission of a felony drug abuse

offense if that conduct was committed by an adult.[4]  This includes Panzeca's son, A.P., who was adjudicated a delinquent child for having committed acts that if charged as an adult would constitute several felony drug abuse offenses  *See In re A.P.,* 2018-Ohio-3423 at ¶ 62-66 and 69-71.  This is because the *commission of* a crime is wholly separate and distinct from what constitutes a *conviction for* a crime.

{¶ 16} In reaching this decision, we note our disagreement with the Tenth District Court of Appeal's holding in *State v. Weeks*, 37 Ohio App.3d 65 (10th Dist.1987), relied on by Panzeca.  In that case, the Tenth District affirmed the trial court's decision granting an offender's motion to dismiss an indictment charging her with obstruction of justice.  Pursuant to the obstruction of justice statute in effect at that time, it was alleged that the offender, "with purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another for crime, or to assist another to benefit from the commission of a crime, did harbor or conceal such other person, [a juvenile], and the crime committed by the person aided was a felony * * *."  *Id.*  In granting the offender's motion to dismiss, the Tenth District found that because "the crime of obstructing justice cannot be committed without the commission of an underlying crime by another," the indictment had to be dismissed since "there was no underlying crime committed by [the juvenile], the person alleged to have been harbored or concealed.  Rather, [the juvenile] was adjudged a delinquent and had not committed a crime."  *Id.* at 67.

{¶ 17} However, as noted above, the *commission of* a crime is wholly separate and distinct from what constitutes a *conviction for* a crime.  Persons, both juveniles and adults, frequently engage in conduct that is prohibited by the Ohio Revised Code.  That is to say

---

4. Pursuant to R.C. 2901.01(B)(1)(a)(i), the term "person" includes all of the following: "[a]n individual, corporation, business trust, estate, trust, partnership, and association[.]"  The term "person" also includes "[a]n unborn human who is viable."  R.C. 2901.01(B)(1)(a)(ii).

persons, both before and after they reach the age of majority, routinely commit acts, or are engaged in the commission of acts, that have been deemed criminal by the Ohio General Assembly. However, as is most often the case, merely because a person has engaged in the commission of a crime does not mean that person will be held accountable through a juvenile delinquency adjudication or an adult conviction. But, even then, the fact remains that conduct prohibited by the Ohio Revised Code and deemed criminal by the Ohio General Assembly was in fact committed. Again, it is merely the commission of, and not a conviction for, a felony drug abuse offense that is required in order to secure a permitting drug abuse conviction. Panzeca's claim otherwise lacks merit.

{¶ 18} Also lacking merit is Panzeca's challenge to her conviction for one count of endangering children in violation of R.C. 2919.22(A). Pursuant to that statute, no parent "shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." Panzeca claims the trial court erred by finding her guilty of child endangering since the state failed to present any evidence that she had a duty to have her son, A.P., "locked up" in order to prevent him from committing further criminal conduct Panzeca, however, was not found guilty of endangering children for failing to have her son "locked up" when she could no longer control him and his actions. Panzeca was found guilty for endangering children based on her facilitation, acquiescence, and knowledge of her son's extensive drug possession, use, and trafficking originating from her home. Therefore, because the state provided sufficient evidence to support Panzeca's child endangering conviction, Panzeca's argument challenging her conviction for one count of endangering children lacks merit.

{¶ 19} Panzeca also argues her conviction was against the manifest weight of the evidence. We again disagree.

{¶ 20} "A verdict can be against the manifest weight of the evidence even though

legally sufficient evidence supports it." *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, ¶ 140. This is because, rather than determine whether the state has met its burden of production at trial, a manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, this court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 168. This court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 34.

{¶ 21} Panzeca argues the trial court erred by finding her guilty since Stadler's testimony presented at trial lacked credibility, thereby necessitating her conviction be reversed. However, while there may be questions regarding Stadler's credibility, a conviction is not against the manifest weight of the evidence merely because the trier of fact believed the prosecution testimony. *State v. Martino*, 12th Dist. Butler No. CA2017-09-139, 2018-Ohio-2882, ¶ 13. This is because, "[a]s the trier of fact in this case, the trial court was in the best position to judge the credibility of the parties and the weight to be given the evidence." *State v. Hilton*, 12th Dist. Butler No. CA2015-03-064, 2015-Ohio-5198, ¶ 20. The trial court, as the trier of fact, was free to believe all, part, or none of Stadler's testimony. *State v. Davis*, 12th Dist. Butler No. CA2017-04-049, 2017-Ohio-8535, ¶ 20. By its verdict, the trial court clearly chose to credit some, if not all, of Stadler's testimony. This includes

Stadler's testimony that A.P. sold him drugs while Panzeca was "standing right there watching it happen" more times than he could count.

{¶ 22} This court will not substitute its evaluation of Stadler's credibility for that of the trial court. *See State v. Sparks*, 12th Dist. Butler No. CA2018-11-226, 2019-Ohio-3145, ¶ 10, citing *State v. Kellum*, 12th Dist. Clinton No. CA97-11-012, 1998 Ohio App. LEXIS 2779, *13-14 (June 22, 1998). This is particularly true here when considering there was other evidence presented at trial that corroborated Stadler's testimony. This includes, among other things, the alleged text message exchanges between Panzeca and A.P., discussed more fully below, as well as Panzeca's Internet browsing history that included searches for "signs my son is a drug dealer," "can the parent be charged when son caught dealing drugs," and "punishment for a parent who knows child is dealing drugs." Such competent, credible evidence is sufficient to establish beyond a reasonable doubt that Panzeca permitted her home to be used for the commission of a felony drug abuse offense. It is also sufficient to establish that Panzeca created a substantial risk to the health or safety of her son, A.P., by violating a duty of care, protection, or support. Therefore, because Panzeca's conviction was supported by sufficient evidence and was not against the manifest weight of the evidence, Panzeca's first assignment of error lacks merit and is overruled.

{¶ 23} Assignment of Error No. 2:

{¶ 24} THE TRIAL COURT ERRED WHEN IT ALLOWED UNAUTHENTICATED DOCUMENTS TO BE ADMITTED AS EVIDENCE AND TO BE READ OUT BY A WITNESS.

{¶ 25} In her second assignment of error, Panzeca argues the trial court erred by admitting into evidence the alleged text message exchanges between her and A.P. Panzeca supports this claim by arguing the printouts of the text messages exchanged between her and A.P. extracted from their cellphones were not properly authenticated. We

- 10 -

disagree.

{¶ 26} "[P]hotographs of text messages sent from a defendant are not hearsay, instead they qualify as a party-opponent admission under Evid.R. 801(D)(2), as long as the statements are properly authenticated."[5] *State v. Davis*, 12th Dist. Madison No. CA2015-05-015, 2016-Ohio-1166, ¶ 21. Pursuant to Evid.R. 901(A), the requirement of authentication as a condition precedent to admissibility is satisfied by introducing "evidence sufficient to support a finding that the matter in question is what its proponent claims." "This threshold requirement for authentication of evidence is low and does not require conclusive proof of authenticity." *State v. Blake*, 12th Dist. Butler No. CA2011-07-130, 2012-Ohio-3124, ¶ 28, citing *State v. Easter*, 75 Ohio App.3d 22, 25 (4th Dist.1991). The state instead needs only to demonstrate a "reasonable likelihood" that the evidence is authentic. *State v. Thomas*, 12th Dist. Warren No. CA2010-10-099, 2012-Ohio-2430, ¶ 15; *State v. Bell*, 12th Dist. No. CA2008-05-044, 2009-Ohio-2335, ¶ 30.

{¶ 27} "While in many cases text messages are authenticated by the testimony of the recipient, this is by no means the only method of authentication." (Citation omitted.) *State v. Thomas*, 11th Dist. Portage No. 2017-P-0094, 2019-Ohio-2795, ¶ 53. There are in fact "a multitude of ways in which the cell phone text messages could be authenticated such that they would be admissible." *Id.* at ¶ 52. "For example, if police officers can provide circumstantial evidence demonstrating a belief that the phone belonged to a certain party, such as identifying it by a unique ringtone and hearing the owner speak to a woman on the phone who was named in the cell phone data extraction reports, this can be sufficient to

---

5. Panzeca claims the text messages exchanged between her and A.P. were business records governed by Evid.R. 803(6). But, contrary to Panzeca's claim, because the text messages were taken directly from her and her son's cellphones without the need to subpoena the phone records from the phone's provider, the authentication requirements found in Evid.R. 803(6) do not apply. *See State v. Moorer*, 7th Dist. Mahoning No. 17 MA 0054, 2019-Ohio-1090, ¶ 70; *see also State v. Williams*, 8th Dist. Cuyahoga No. 106563, 2018-Ohio-4612, ¶ 29.

establish ownership of the phone for the purpose of authenticating cell phone text message records." *Id.* at ¶ 53, citing *State v. Norris*, 2d Dist. Clark No. 2015-CA-22, 2016-Ohio-5729, ¶ 39-43.

{¶ 28} Panzeca claims the trial court "found the authenticity burden was proven by the State simply by hav[ing] the witness read out loud from the [printouts] over the defense's objection." But this is not what happened. The detective who analyzed Panzeca's and A.P.'s cellphones testified that he extracted the data from their two cellphones by using a Cellebrite UFED Touch device.[6] This device, as the detective testified, is used to download and extract data from cellphones like the ones belonging to Panzeca and A.P. Once the data was extracted from Panzeca's and A.P.'s cellphones, the detective used a "physical analyzer" computer program installed on a forensic computer to create "different tabs of the call logs and the text messages" found within that extracted data. The detective then used the "physical analyzer" to generate a readout of the extracted data that he reviewed on the forensic computer's computer screen. This readout can also be printed out into a more easily readable physical document called a "UFED reader report."

{¶ 29} The detective testified that the data extracted from Panzeca's and A.P.'s cellphones provided him with their two cellphones' phone numbers. The detective also testified that the data extracted from Panzeca's and A.P.'s cellphones provided him with all of the text messages that could be recovered from their two cellphones. These text messages were all part of the readout generated by the "physical analyzer" program the detective used to "carve out" the data from the "one big chunk of memory" initially extracted from Panzeca's and A.P.'s cellphones. This data included several text messages sent from

---

6. The acronym "UFED" stands for Universal Forensic Extraction Device.

Panzeca's cellphone that matched the text messages received by A.P.'s cellphone.[7] When questioned about the printouts of these text messages, the detective testified that he had himself printed out those text messages as they appeared on the UFED reader report submitted by the state.

{¶ 30} The record also contains numerous text messages sent to A.P.'s cellphone from the contact name labeled "Mom" as they appeared on the UFED reader report submitted to the trial court. The phone number assigned to the contact labeled "Mom" in A.P.'s phone is the same phone number associated with the cellphone belonging to A.P.'s mother, Panzeca. One such text message conversation between A.P.'s phone and "Mom" included the following text message exchange taking place on April 13, 2017:

> Mom: I don't think you should be sleeping in that room downstairs
>
> A.P.: I don't think I'll be sleeping
>
> Mom: Why?
>
> Mom: [A.P.]
>
> A.P.: Acid
>
> A.P.: And shrooms
>
> Mom: How many?
>
> A.P.: I don't know.
>
> Mom: You don't know how many tabs?
>
> A.P.: Three.

---

7. We note that there were only four text messages extracted from Panzeca's phone that matched the text messages extracted from A.P.'s phone. When asked why that may be, the detective testified that the four matching text messages had already been "deleted" from Panzeca's phone. "And the four messages on [Panzeca's] phone that corresponded with [A.P.'s] phone were the only ones that UFED Touch was able to recover." The detective testified that this was because "[t]he algorithms that control the phone's memory dictate how the deleted stuff starts to get overwritten. It's just a matter of chance if it's not overwritten by the time we get to it."

{¶ 31} The following is another text message exchange between A.P.'s phone and "Mom" that occurred eight days later on April 21, 2017:

Mom: NO ONE goes outside

Mom: Did you get that

A.P.: Ok

Mom: Anybody have alcohol in the basement?

Mom: Answer me

A.P. No

Mom: Do you think [C.] or [E.] would snitch and call cops if they saw something one of you posted while at our house?

Mom: No one should post anything with any evidence

A.P.: Ok

{¶ 32} When considering the state needs only to demonstrate a "reasonable likelihood" that the evidence is authentic, i.e., evidence sufficient to support a finding that the matter in question is what its proponent claims, we find this to be more than enough evidence to support a finding that the documents comprising the UFED reader report submitted by the state were properly authenticated printouts of the alleged text message exchanges between Panzeca and A.P. *See, e.g., United States v. Hunt*, A.F.C.C.A. No. ACM S32506, 2019 CCA LEXIS 310, *32-33 (July 11, 2019) (a UFED reader report was properly authenticated where an investigator described the process he used to extract the text messages from the accused's cellphone and thereafter reviewed the "pertinent pages" of the data collected even though a different investigator had prepared the physical report admitted into evidence). The fact that the detective himself did not print out each of the documents comprising the UFED reader report goes more to the weight that should be given to that evidence rather than that evidence's admissibility. That is to say Panzeca's

"argument alleging a lack of proof that [s]he had actually sent the message concerns the weight of the evidence, rather than its authenticity." *State v. Sherman*, 5th Dist. Tuscarawas No. 2015 AP 12 0067, 2016-Ohio-4967, ¶ 31.

{¶ 33} This is undoubtably the case here when considering the detective specifically testified that the printouts taken from the UFED reader report fairly and accurately represented the text messages he had extracted from Panzeca's and A.P.'s cellphones. As the detective testified, "I looked at both phones for Exhibit 33 and 34," which were the printouts from Panzeca's cellphone, "[a]nd then afterwards I have reviewed what's in now 31 and 32," which were the printouts from A.P.'s cellphone, all of which the detective testified were "a true and accurate representation of what I got off those phones." Such testimony directly contradicts Panzeca's claims that she was unable to challenge whether the printouts admitted into evidence were edited, manipulated, or doctored by the state. Therefore, because the state provided more than enough evidence to meet the low threshold requirement for authentication, the trial court did not err by admitting into evidence the printouts of the alleged text message exchanges between Panzeca and her son, A.P. Accordingly, finding no error in the trial court's decision, Panzeca's second assignment of error lacks merit and is overruled.

{¶ 34} Assignment of Error No. 3:

{¶ 35} THE TRIAL COURT ERRED IN OVERRULING THE MOTION TO SUPPRESS.

{¶ 36} In her third assignment of error, Panzeca argues the trial court erred by overruling her motion to suppress since the search warrant affidavit submitted to the trial court contained several misleading statements. But, as noted by the state, this court has already rejected substantially similar arguments raised by Panzeca's son, A.P., as part of his direct appeal in *In re A.P.* There is nothing in the record now before this court that would

change this court's earlier decision on those matters. There is also nothing in the record that would necessitate this court to reconsider that decision in this case. Therefore, for the reasons already stated by this court in *In re A.P.*, 2018-Ohio-3423 at ¶ 62-66 and 69-71, Panzeca's third assignment of error lacks merit and is overruled.

{¶ 37} Assignment of Error No. 4:

{¶ 38} THE TRIAL COURT ERRED WHEN IT ALLOWED A WITNESS TO TESTIFY ABOUT INFORMATION HE COULD NOT HAVE PERSONAL KNOWLEDGE OF.

{¶ 39} In her fourth assignment of error, Panzeca argues the trial court erred by allowing Stadler to testify about information that was outside his personal knowledge; specifically, by permitting Stadler to testify as to what Panzeca had observed going on in her home. Stadler, however, did not testify about what Panzeca had personally observed in her home. Stadler instead testified as to what he believed Panzeca had the *opportunity to observe* while she was in her home. This includes, most notably, the fact that A.P. had frequently sold him drugs while in Panzeca's presence. Therefore, because we find nothing improper about Stadler's testimony that would render it inadmissible at trial, the trial court did not err by allowing Stadler to testify as he did. Accordingly, finding no error in the trial court's decision, Panzeca's fourth assignment of error lacks merit and is overruled.

{¶ 40} Assignment of Error No. 5:

{¶ 41} THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT IMPOSED A JAIL SENTENCE UPON THE APPELLANT BECAUSE THE TRIAL COURT BELIEVED SHE WOULD BE SUCCESSFUL ON COMMUNITY CONTROL.

{¶ 42} In her fifth assignment of error, Panzeca argues the trial court erred by sentencing her to 180 days in jail as a condition of her community control term. Panzeca claims this condition is "undeniably harsh" for a first-time offender like herself and carries with it the possible loss of employment, the loss of her house, and concerns regarding how

she will pay her bills and care for her children. Panzeca believes the trial court should have instead given her an "opportunity to succeed or fail on community control" before finding it necessary to send her to jail. The trial court, however, "has broad discretion in imposing conditions of community control." *State v. Little*, 1st Dist. Hamilton No. C-180523, 2019-Ohio-4488, ¶ 14; *Intihar*, 2015-Ohio-5507 at ¶ 28 ("[a] trial court has broad discretion in determining the conditions of probation"). Given the facts of this case, the trial court determined that sentencing Panzeca to 180 days in jail as a condition of her community control "is what is called for in this case." We find no error in the trial court's decision. Therefore, finding no error in the trial court's decision sentencing Panzeca to 180 days in jail as a condition of her community control, Panzeca's fifth assignment of error lacks merit and is overruled.

{¶ 43} Assignment of Error No. 6:

{¶ 44} THE TRIAL COURT ERRED WHEN IT DENIED THE MOTION FOR INTERVENTION IN LIEU OF CONVICTION.

{¶ 45} In her sixth assignment of error, Panzeca argues the trial court erred by finding she was not statutorily eligible for ILC. We disagree.

{¶ 46} By enacting an ILC procedure, "'the legislature made a determination that when chemical abuse is the cause or at least a precipitating factor in the commission of a crime, it may be more beneficial to the individual and the community as a whole to treat the cause rather than punish the crime.'" *State v. Massien*, 125 Ohio St.3d 204, 2010-Ohio-1864, ¶ 10, quoting *State v. Shoaf*, 140 Ohio App.3d 75, 77 (10th Dist.2000), citing *State v. Baker*, 131 Ohio App.3d 507, 510 (7th Dist.1998). This court conducts a de novo review of whether an accused is statutorily eligible for ILC. *State v. Legeson*, 12th Dist. Warren No. CA2018-05-054, 2019-Ohio-919, ¶ 12, citing *State v. Casto*, 12th Dist. Clermont No. CA2008-08-033, 2009-Ohio-791, ¶ 12. This means "we independently review the record

and give no deference to the court's interpretation of the ILC statute." *State v. Kormos*, 12th Dist. Clermont No. CA2011-08-059, 2012-Ohio-3128, ¶ 13.

{¶ 47} As noted above, the trial court found Panzeca was not statutorily eligible for ILC since her alcohol usage was not a factor leading to the criminal charges being brought against her as required by R.C. 2951.041(B)(6). We agree. Just as the trial court found, the fact that Panzeca may have used alcohol to help her sleep played little, if any, role in her permitting rampant drug possession, use, and trafficking to occur in her home by her son, A.P., and others. Although Panzeca may have problems with alcohol, it is well established that ILC is not available to just anyone who suffers from addiction or needs substance abuse treatment. *State v. Tolson*, 12th Dist. Preble No. CA2014-12-015, 2015-Ohio-2320, ¶ 13. "Rather, ILC is available where drug or alcohol usage was a factor leading to the instant offense." (Emphasis deleted.) *Id.* Therefore, because the trial court did not err by finding Panzeca was not statutorily eligible for ILC, Panzeca's sixth assignment of error lacks merit and is overruled.

{¶ 48} Judgment affirmed.

M. POWELL, P.J., and RINGLAND, J., concur.